169 N.J. Super. 76 (1979)
404 A.2d 320
NEW JERSEY BUILDERS ASSOCIATION, ETC., ET AL., APPELLANTS, EDWARD WUILLERMIN ET AL., INTERVENORS,
v.
DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY, ETC., ET AL., RESPONDENTS.
TOWN OF HAMMONTON, APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 1979.
Decided June 12, 1979.
*80 Before Judges LYNCH, CRANE and HORN.
Mr. Michael J. Gross argued the cause for appellants New Jersey Builders Association et al. (Messrs. Giordano, Halleran & Crahay, attorneys).
Mr. John Lee Madden argued the cause for intervenors.
Mr. Vincent J. Sgro argued the cause for appellant Town of Hammonton (Mr. Mark A. DeMarco on the brief).
*81 Mr. Richard M. Hluchan, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Mr. John J. Degnan, Attorney General, attorney; Ms. Erminie L. Conley, Assistant Attorney General, of counsel (Messrs. Hluchan and Lawrence E. Stanley, Deputy Attorneys General, on the briefs).
Messrs. McTighe & McTighe filed a brief on behalf of amici curiae American Farm Bureau Federation and New Jersey Farm Bureau (Messrs. Allen A. Lauterbach, General Counsel, C. David Mayfield, Jerome I. Werderitch, Assistant Counsel and Arthur A. McTighe on the brief).
Mr. Benjamin Levine filed a brief on behalf of amicus curiae Environmental Defense Fund, Inc. (Mr. James T.B. Tripp, of counsel and on the brief).
The opinion of the court was delivered by LYNCH, P.J.A.D. (retired and temporarily assigned).
By this appeal the New Jersey Builders Association and several affiliate Associations (hereafter Builders), together with a group of intervening farmers and the Town of Hammonton, challenge the validity of certain regulations adopted by the Commissioner of the Department of Environmental Protection (DEP) which (1) established water quality standards for the 760 square miles of land popularly called the Central Pine Barrens, and (2) designated those lands as a "critical area" for sewerage purposes.
Though in its past history the Pine Barrens was the center of bog iron production, glass making and brick and tile manufacturing, today its principal use is agriculture, mainly for the growing of cranberries and blueberries. Among the states New Jersey ranks first and third in the nationwide production of blueberries and cranberries, respectively. Such activities are dependent upon the continued high quality of the river and subsurface waters which are characteristic of the area.
*82 The soil of the area is sandy and sterile. Because of its porus nature, its rapid percolation rates and the relatively high water-table levels it is subject to wide spreading of pollutants and is extremely susceptible to contamination from the surface. The sandy soil is vulnerable to nitrate contamination from septic tank effluent. Such nitrates are a known hazard to public health.
The foregoing constitutes a general view of the conditions in the Pine Barrens which require regulation both of water quality and sewage disposal systems. This is especially so in view of the recent and prospective development therein with significant population growth. Since 1950 the population of the Pine Barrens has increased 68% whereas the rest of the State for the same period has increased only 35%. Prospective increase is even more significant.
In other words, the finding of the Commissioner of DEP of a need of establishment of standards for water quality and septic systems control is clearly supported by ample credible evidence in the record. See Municipal Sanitary Landfill Auth. v. Hackensack, &c. Comm'n, 120 N.J. Super. 118 (App. Div. 1972).

I

The Water Quality Standards Appeal
Appellants Builders contend that establishment of the water quality standards by the Commissioner of DEP was not within his statutory authority. In doing so Builders cite N.J.S.A. 58:10-1 et seq. as the purported statutory base for the regulation and argue that since that statute only concerns pollution of potable water the standards adopted to protect the ecosytem,[1] including dwarf pine trees and *83 sparse vegetation, far exceed the statutory proscription of N.J.S.A. 58:10-1 et seq.
In the first place, N.J.S.A. 58:10-1 et seq. was repealed by the Water Pollution Control Act, L. 1977, c. 74; N.J.S.A. 58:10A-1 et seq. That Act provides:
The Legislature finds and declares that pollution of the ground and surface waters of this State continues to endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water, even though a significant pollution abatement effort has been made in recent years. It is the policy of this State to restore, enhance and maintain the chemical, physical, and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water.

The Legislature further finds and declares that the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92-500; 33 U.S.C. 1251 et seq.) establishes a permit system to regulate discharges of pollutants and provides that permits for this purpose will be issued by the Federal Government or by states with adequate authority and programs to implement the regulatory provisions of that act. It is in the interest of the people of this State to minimize direct regulation by the Federal Government of wastewater dischargers by enacting legislation which will continue and extend the powers and responsibilities of the Department of Environmental Protection for administering the State's water pollution control program, so that the State may be enabled to implement the permit system required by the Federal Act. [N.J.S.A. 58:10A-2; emphasis supplied]
The purpose of the act is to facilitate the restoration and maintenance of unpolluted surface and ground waters of the State in order to protect the water and the environment. See N.J.S.A. 58:10A-4(c). Generally, this type of statute is considered in environmental terms as a "nondegradation" statute. That is, the water quality standards and permit programs developed pursuant thereto are to ensure that water pollution will not worsen. In furtherance of that goal the
* * * Commissioner shall have [the] power to prepare, adopt, amend, repeal and enforce * * * reasonable codes, rules, and regulations *84 to prevent and abate water pollution and to carry out the intent of this act, either throughout the State or in certain areas of the State affected by a particular water pollution problem. N.J.S.A. 58:10A-4.
Accordingly, by N.J.A.C. 7:9-4.6 et seq. and N.J.A.C. 7:9-14.6 et seq., he has adopted water quality standards.
Second, the Commissioner's powers cannot be limited under N.J.S.A. 58:10A-1 to set regulations only for potable water, since another act exists which specifically controls potable drinking water. It is known as the Safe Drinking Water Act, L. 1977, c. 224; N.J.S.A. 58:12A-1 et seq. The legislative purpose of that Act specifies that "the maintenance of high-quality potable water is essential in order to safeguard the health and welfare of the people of the State * * *." N.J.S.A. 58:12A-2. Under this act the Commissioner is empowered to promulgate "State primary drinking water regulations * * *, secondary drinking water regulations * * * and other regulations to protect potable waters." N.J.S.A. 58:12A-4(a).
Third, undoubtedly water pollution prevention is directly related to water quality planning programs. N.J.S.A. 58:11A-1 et seq., known as the Water Quality Planning Act, L. 1977, c. 75, parallels the Water Pollution Control Act in declaring a broad environmental purpose:
a. The Legislature finds that the people of the State have a paramount interest in the restoration, maintenance and preservation of the quality of the waters of the State for the protection and preservation of public health and welfare, food supplies, public water supplies, propagation of fish and wildlife, agricultural and industrial uses, aesthetic satisfaction, recreation, and other beneficial uses; and that the severity of the water pollution problem in the State necessitates continuing water quality management planning in order to develop and implement water quality programs in concert with other social and economic objectives. The Legislature further finds that the water quality is dependent upon factors of topography, hydrology, population concentration, industrial and commercial development, agricultural uses, transportation and other such factors which vary among and within watersheds and other regions of the State and that pollution abatement programs should *85 consider these natural and man-made conditions that influence water quality. The Legislature further finds that the State's groundwaters are a precious and vulnerable resource.
b. The Legislature declares that the objective of this act is, wherever attainable, to restore and maintain the chemical, physical and biological integrity of the waters of the State, including groundwaters, and the public trust therein; and that areawide waste treatment management planning processes should be developed and implemented in order to achieve this objective and to assure adequate control of sources of water pollutants in the State. [N.J.S.A. 58:11A-2(a), (b); emphasis supplied]
Under this act the Commissioner has broad power pursuant to N.J.S.A. 58:11A-5 to establish a regulatory plan to:
c.
(1) to provide control or treatment of all point and nonpoint sources of pollution, including in-place or accumulated pollution sources, to the extent practicable;
(2) to regulate the location, modification, and construction of any facilities within such area which may result in any discharge in such area, and
(3) to assure that any industrial or commercial wastes discharged into any treatment works in such area meet applicable pretreatment requirements; * * * [emphasis supplied].
In summary, we find there are three acts in Title 58 of the Revised Statutes which seek to promote water quality and aid the ecosystem: the Water Pollution Control Act focuses on water quality standards and a permit system; the Safe Drinking Water Act centers on drinking water treatment plants, and the Water Quality Standards Act deals with areawide waste management planning. All of the acts seek to prevent the degradation of water quality and to preserve the environment. All of the acts give the DEP Commissioner the power to protect ground water and surface water. All of the acts seek to lessen the impact of pollution from point sources and nonpoint sources. Undoubtedly, given the breadth of the legislation, its goal to promote public health and welfare through preservation of water quality and the environment, any question about the jurisdiction of *86 the DEP Commissioner presumptively should be resolved in his favor. Where a statute seeks to promote a public purpose, it should be liberally construed. Newark v. N.J. Health Dept., 109 N.J. Super. 166, 178-179 (App. Div. 1970); app. after remand sub nom. State v. North Jersey Dist. Water Supply Comm., 127 N.J. Super. 251 (App. Div. 1974), cert. den. 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974).
The importance of protecting water has long been recognized as an important public purpose. Washington Tp. v. Ridgewood, 46 N.J. Super. 152 (Ch. Div. 1957), aff'd 26 N.J. 578 (1958); K.S.B. Tech. Sales v. North Jersey Dist. Water Supply, 75 N.J. 272, 287-288 (1977); State v. East Shores, Inc., 154 N.J. Super. 57 (Ch. Div. 1977), mod. 164 N.J. Super. 530 (App. Div. 1979).
The importance of utilizing nondegradation controls has also been sanctioned by federal law. See the Federal Water Pollution Control Act, 33 U.S.C.A. § 1251 et seq. (FWPCA). Accord 40 C.F.R. § 130.17(e) et seq. For this reason, some commentators feel that state laws which do not seek to "protect and enhance" water are invalid as not being strong enough under the FWPCA. See Rodgers, Handbook in Environmental Law, § 4.8 at 417 (1977). Also Reserve Min. Co. v. Minnesota Pollution Control Ag., 294 Minn. 300, 200 N.W.2d 142 (Sup. Ct. 1972).
The importance of protecting the environmental ecosystem is also recognized. E.g., Zabel v. Tabb, 430 F.2d 199, 209-210 (5 Cir.1970), cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). (Secretary of the Army could refuse to authorize dredge permits for ecological reasons); Hillsborough Cty. Envir. P. Comm'n v. Frandorson Prop., 283 So.2d 65 (Fla. D. Ct. App. 1973).
The Commissioner's water quality regulations which seek to protect the ecosystem (water and environment) are within the purview of the water Pollution Control Act, N.J.S.A. 58:10A-1. The implementation of this pollution control can be aided by water quality programs enacted pursuant to N.J.S.A. 58:11A-1. The Commissioner, within *87 his discretion, can exercise his authority and only deal with potable drinking water under N.J.S.A. 58:12A-1. There is no indication of any intention on the part of the Legislature to delimit the Commissioner's power. Therefore, Builders' attack that the regulations are outside the scope of delegated authority must fail. N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561 (1978); In re Weston, 36 N.J. 258, 263 (1961).
Once the regulations are arguably within the goals of legislation, they are presumed valid. Motyka v. McCorkle, 58 N.J. 165, 179 (1971). Thereafter, the appellate court can review the actions of an administrative agency only for an abuse of discretion. In re Commuter Operating Agency's Determination, 164 N.J. Super. 311, 316 (App. Div. 1978), supp. opinion after remand 166 N.J. Super. 430 (App. Div. 1979), certif. den. 81 N.J. 262 (1979).
All of the appellants attack the regulations as being based on insufficient information gathered as a result of inadequate methodology.
We conclude that there was substantial data supporting DEP's findings that the quality criteria in the regulations reflect existing water quality values. The data sources, as to surface water quality, are supported by extensive water sampling conducted during the past ten years. Other data supporting DEP's conclusions are contained in a DEP study, "Special Stream Survey on the Mullica River and its Tributaries," in the Joint DEP-U.S.G.S. (United States Geological Survey) analysis found in Water Resources Circular No. 22 and other studies.
The testimony of John Murphy of the United States Geological Survey, a qualified expert with relation to the ground water of the Central Pine Barrens, demonstrated the adequacy of DEP's data for ground water quality. He testified:
* * * now the data base for which, at least, the ranges in the water quality standards were drawn are from analyses from wells throughout *88 that whole * * * area * * *. For the most part, the water quality fell within the ranges that have been indicated in these standards that have been promulgated.
* * * * * * * *
But by far and large, the data which consists of not just one or two analyses but have hundreds of analyses, will fall within this particular range. Now, this is based on statistical analysis, if you want to run statistical analysis of the data base. Now, a quotation was made that there was one analysis made on the Cohansey aquifer in Ocean County. There have been, to my knowledge, 56 analyses made of three wells, * * * the data is all available.
* * * * * * * *
Well, what I'm officially saying is that for the most part any time you put a hole in the Cohansey aquifer, chances are far greater you will get a chemical analyses [sic] that will fall within the ranges promulgated in the standards given by the State * * * they represent the native water, ground water quality in the Cohansey aquifer.
Intervenors-appellants (Lee Brothers, Inc., and other farmer interests) argue that the water quality standards dramatically affect their agricultural enterprises. Specifically, they contend that the data as to water quality was gathered, as stated in their brief, "at irregular intervals (as little as four times a year) at non-representative sites (a total of six) and the data was obtained at points far downstream where water change occurs." In particular, the intervenors contend that the studies for nitrates and phosphates (products of the use of fertilizer) were made basically in nongrowing months of the year when fertilizer is not used, thus furnishing a standard of water quality far above the normal standard when nitrate and phosphates from fertilizer are far more prevalent.
At our request on oral argument the State has since specifically replied to the intervenors' argument. It points out that the "nongrowing" month tests referred to by the farmers are based only on the Mullica River Study and that DEP has extensive data in addition to that study; that 75 sampling stations generated data and that 51 of those sampling stations were in the Central Pine Barrens during the period 1973 through 1977; that analysis of those samplings demonstrates *89 that the sampling was done on a year-round basis, including the months when agricultural activity is at its height.
We therefore conclude that appellants have not sustained their heavy burden to establish that the regulations promulgating water quality standards were unreasonable, arbitrary and capricious. Consolidation Coal Co. v. Kandle, 105 N.J. Super. 104, 112-120 (App. Div. 1969), aff'd o.b. 54 N.J. 11 (1969).
Appellants also contend that the regulations are unreasonable because the criteria cannot be economically met when septic systems are installed, for the asserted reason, as said in Builders' brief, that "there is no known economically feasible means of sewage treatment which will meet the Water Quality standards." The brief goes on to support this contention by saying: "Even a DEP representative acknowledged that the water quality standards could not be met by existing technology involving septic systems or large scale sewage treatment facilities."
The latter reference is inaccurate. First, the record reference made did not relate to septic tank systems but to sewage treatment plants serving sanitary sewer systems and it was with respect to those facilities that the witness stated they would "probably be quite expensive." However, the fact that sewage treatment plants would be expensive does not translate into a fact that they are technologically unfeasible.
The short answer to appellants' contention that it is impossible to comply with the water quality standards in the installation of the septic systems is the contemporaneous construction given to the regulations of DEP. In the application of the regulations DEP has received 2,638 applications for septic tank installations and has approved 2,159, or approximately 80% of them. Such practical construction by an administrative agency is a substantial factor in determining the effect of the regulation. See 2 Sutherland, Statutory Construction (4 ed. 1973), § 49.04 at 235. And an administrative agency's interpretation of its own regulation *90 is entitled to great weight. In re Plainfield-Union Water Co., 57 N.J. Super. 158, 177 (App. Div. 1959); cf. Hoeganaes Corp. v. Dir. of Div. of Tax., 145 N.J. Super. 352, 360 (App. Div. 1976). It therefore cannot be said that compliance with the regulations in the installation of septic tanks is not technologically feasible under the regulations. If, however, an individual believes a permit was arbitrarily denied, his remedy lies in an appeal to the courts. The appellate court would then have specific findings on which to review DEP's denial of an individual permit.
The action of the Commissioner adopting the water quality standards is affirmed.

II

The Critical Area Designation Appeal
On this appeal appellants attack the boundary of the "critical area" in the Pine Barrens. They contend, as put in the brief of the Town of Hammonton, which is within the area, that selection of the boundaries was arbitrary, "without any relationship to a threatened aquifer, the specific ecological areas or any other scientific or rational basis for the specific area designated."
DEP asserts it based its delineation of the Pine Barrens on the quality of the water in the area, the uniformity and similarity of the water in the area, the extent of development in the area and the potential for degradation in the area.
N.J.S.A. 58:10A-1 et seq. declares that it is the policy of this State "to restore, enhance and maintain" the quality of state waters for ecological and public health purposes. To that end the DEP Commissioner is empowered to promulgate regulations:
* * * to prevent, control or abate water pollution and to carry out the intent of this act, either throughout the State or in certain areas of the State affected by a particular water pollution problem. [N.J.S.A. 58:10A-4; emphasis supplied]
*91 Clearly, the burden of appellants to demonstrate that the area designated herein is unreasonable is a heavy one. In our view they have not sustained that burden. The "critical area" Pine Barrens delineation is supported by substantial credible evidence in the record. See Meadowlands Reg'l Develop. Agency v. State, 112 N.J. Super. 89, 101-102 (Ch. Div. 1970), aff'd 63 N.J. 35 (1970).
Amici Farm Bureaus suggest that the DEP regulations as applied to the Pine Barrens are preempted by § 502 of the National Parks and Recreation Act of 1978, P.L. 95-625, 92 Stat. 3467 (November 10, 1978), which provides for the establishment of a Pinelands National Preserve in New Jersey consisting of over 1,000,000 acres of land. § 502(a) (1). This act provides that federal monies be available for land acquisition and development of an Pineland area preservation plan.
The role of the court in deciding preemption cases is to determine "whether the [State] law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). But this case is not one where the subject matter (ecology) sought to be regulated by its very nature precludes regulation by the State. E.g., Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956) (subversives); San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (labor). The issue becomes whether Congress, through the Pine Barrens Act, has "occupied the field" of Pine Barrens preservation to the exclusion of the states.
Here the federal act seeks to aid the preservation of the environment. This is an area where the national interest accommodates diversity of regulation. Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) (health and safety). Moreover, the national act deals solely with the preservation of certain Pinelands regions. However, the state act under attack seeks to protect *92 water quality and the surrounding ecosystem. The federal act is not comprehensive in that it seeks only to aid states in the acquisition of land for a limited environmental objective.
Moreover, the federal act provides that the Pine Barrens preservation is to be:
In conjunction with existing State programs and planning processes, a plan to implement the provisions of the Clean Water Act and the Safe Drinking Water Act which pertain to the surface and ground waters of the Pinelands National Reserve. [§ 502(f) (9); emphasis supplied].
There is a clear Congressional statement that state regulation is necessary and state regulation of the Pine Barrens is to be accomplished through water quality control. Therefore, we conclude that Congress has not preempted state action in the Pine Barrens.
Builders contend that DEP does not have jurisdiction to regulate septic tanks on realty improvements unless the septic tank is in a development of over 50 units or the housing development is intermunicipal. N.J.S.A. 58:11-25.1 (a section of the Water Supply and Sewer Systems in Realty Improvements Act, N.J.S.A. 58:11-23 et seq.) provides:
No subdivision approval shall be granted by any municipal or other authority in the State to cover 50 or more realty improvements, or less than 50 where the subdivision extends into an adjoining municipality or municipalities and will, in the aggregate, cover 50 or more realty improvements, until the State Department of Environmental Protection has certified that the proposed water supply and sewerage facilities for realty improvements comply with applicable State standards.
Pursuant to N.J.S.A. 58:11-43, 44 and 45, the State has enacted regulations requiring building and construction permits for individual realty improvements and septic tanks in the "critical area" of the Pine Barrens. The State concedes the jurisdiction to regulate individual septic tanks was not given to it under N.J.S.A. 58:11-25.1. However, it argues *93 that since DEP has been regulating individual construction of septic tanks under the law for six years, the Legislature has sanctioned DEP construction of the statute. See Automatic Merchandising Council v. Glasser, 127 N.J. Super. 413, 420 (App. Div. 1974).
The State's reliance on this concept in this area is misplaced. Where a statute is ambiguous and an administrative agency has construed the statute for a period of years without legislative change, then such inaction by the Legislature is deemed to be evidence of legislative acceptance of agency determination. However, where it is clear on the face of the statute that an agency does not have jurisdiction over subject matter, there is no room to sanction agency action which contravenes the enabling statute. See Jersey City Incinerator Auth. v. Public Utilities Dep't, 146 N.J. Super. 243, 252-253 (App. Div. 1976), certif. granted 74 N.J. 257 (1977), app. dism. as moot 75 N.J. 600 (1978). Indeed, the Legislature has amended N.J.S.A. 58:11-25.1 several times since the enactment of the initial law which gave DEP jurisdiction over 50 units or more. In 1971 (effective 1972) the Legislature broadened DEP's jurisdiction to realty improvements with 25 or more units. In 1972 (effective 1973) the Legislature reduced DEP's jurisdiction by allowing control again over realty improvements which exceeded 50 units. Arguably, the Legislature has shown an intention to reduce DEP control over individual realty improvements under N.J.S.A. 58:11-23 et seq.
However, under N.J.S.A. 58:10A-1 et seq., the DEP has the power to regulate discharges of individual septic tanks unless the Commissioner exempts discharges from septic tanks from regulation. N.J.S.A. 58:10A-6. DEP can require an applicant to demonstrate whether a septic tank discharge will affect the water quality standards. In accordance with the statutory authority granted under the Title 58 of the Revised Statutes legislation DEP has enacted the following permit regulation:

*94 (a) No person shall hereafter construct or install sewerage facilities in a realty improvement in a critical area until approval has first been obtained in writing from the department.
(b) In reviewing plans for such systems and in determining conditions under which such plans may be approved, the Department of Environmental Protection shall require strict compliance with the "Standards for the Construction of Sewerage Facilities for Realty Improvements" promulgated pursuant to the authority of the "Realty Improvement Sewerage and Facilities Act (1954)", N.J.S.A. 58:11-23 et seq.
(c) The department may also consider such other factors which affect, or may tend to affect, the safe and proper operation of sewerage facilities, including but not limited to:
1. Soil conditions;
2. Ground-water table levels;
3. Population densities;
4. Projected growth trends;
(d) The department's review of sewerage facilities in the Central Pine Barrens Critical Area, in addition to those factors listed in 7:9-10.4(c) above, shall also consider factors which affect or may tend to affect, ground-water quality and the safe and proper operation of sewerage facilities, including but not limited to:
1. The impact of such sewerage facilities on ground-water quality; and
2. The densities appropriate for sewerage facilities. [N.J.A.C. 7:9-10.4; emphasis supplied]
Statutes which are enacted for the protection and preservation of public health are to be construed liberally. 3 Sutherland, Statutory Construction (4 ed. 1974), § 71.02 at 313; State v. Owens-Corning Fiberglass, 100 N.J. Super. 366, 382 (App. Div. 1968), aff'd 53 N.J. 248 (1969). We therefore sanction individual regulation of septic tanks under a reading in pari materia of N.J.S.A. 58:10A-1 et seq., N.J.S.A. 58:11A-1 et seq. and N.J.S.A. 58:11-23 et seq.
Appellant Town of Hammonton (town) argues it will be unable to fulfill its duty to provide its fair share of low-cost housing as required by South Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151 (1975), app. dism. and cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mt. Laurel). Therefore, the town contends that the critical area designation is invalid. We disagree.
*95 In Mt. Laurel defendant municipality argued that environmental considerations justified large-lot zoning. The court rejected the township's argument. However, it recognized that environmental factors can justify large-lot zoning if "the danger and impact [on the environment] [is] substantial and very real * * * not simply a make weight to support exclusionary housing measures or preclude growth * * *." 67 N.J. at 187. In Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481 at 545 (1977), the Supreme Court again affirmed its recognition that "environmental constraints" may necessarily preclude development.
Indeed, the very fact that the Supreme Court has not invalidated statutes and regulations which control and limit development in the Hackensack Meadowlands, N.J.S.A. 13:17-1; the Wetlands, N.J.S.A. 13:9A-1, and the Coastal Area Zone, N.J.S.A. 13:19-1, suggests that the preservation of water quality and the natural environment must be balanced against the dictates of Mt. Laurel. See, e.g., Meadowlands Reg'l Develop. Agency v. State, supra, 63 N.J. 35; Accord: Sands Point Harbor, Inc. v. Sullivan, 136 N.J. Super. 436 (App. Div. 1975); Toms River Affiliates v. Environmental Protect. Dep't, 140 N.J. Super. 135 (App. Div. 1976), certif. den. 71 N.J. 345 (1976).
Appellant town also argues that the DEP regulations constitute a confiscatory taking of land without just compensation. In Morris Cty. Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963), a township greatly restricted the use of swampland in the town. The court held the regulation was excessive in light of the interest sought to be protected, preservation of the swampland, and therefore constituted a "taking." See also, Yara Engineering Corp. v. Newark, 132 N.J.L. 370 (Sup. Ct. 1945); Plainfield v. Middlesex Borough, 69 N.J. Super. 136 (Law Div. 1961).
The relevant general rule was stated by Justice Holmes in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922):

*96 * * * while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. [260 U.S. at 415, 43 S.Ct. at 160, 67 L.Ed. at 326]
In 1963 swampland preservation was not a strong enough public interest to warrant the degree of its regulation in Morris County. However, in AMG Associates v. Springfield Tp., 65 N.J. 101 (1974), the Supreme Court said:
It is to be emphasized that we deal in this case only with the split lot situation where there is a deprivation of all practical use of the smaller portion thereof. The approach to the taking problem, and the result, may be different where vital ecological and environmental considerations of recent cognizance have brought about rather drastic land use restriction in furtherance of a policy designed to protect important public interests wide in scope and territory as for example, the coastal wetlands act, N.J.S.A. 13:9A-1 et seq. and various kinds of flood plain use regulations. Cases arising in such a context may properly call for a reexamination of some of the statements 10 years ago in the largely locally limited Morris County Land case, supra (40 N.J. 539, 193 A.2d 232). See generally, Bosselman, et al., The Taking Issue (Council on Environmental Quality, 1973). [n. 4 at 112; emphasis supplied]
The general trend in the law is to support legislation to protect certain areas even though it diminishes the value of private persons' land. Sands Point Harbor, supra, 136 N.J. Super. 436; Toms River Affiliates, supra, 140 N.J. Super. 135. In the instant case the regulations were not enacted in order to create a public benefit. Rather, the restrictions on the use of citizens' property is in order to prevent a harm resulting from the change in the natural character of the property. When a regulation is enacted in order to prevent harm, it is a proper exercise of the police power and there is no right to compensation for the diminution in the value of the property. Lom-Ran v. Environmental Prot. Dep't, 163 N.J. Super. 376, 385 (App. Div. 1978); *97 Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); also, Rathkopf, The Law of Zoning and Planning (4th ed. 1978), § 703, where the difference between a valid exercise of the police power and a taking is summarized:
Many years ago, Professor Freund stated in his work on The Police Power, sec. 511, at 546-547, `It may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful * * *. From this results the difference between the power of eminent domain and the police power, that the former recognises [sic] a right to compensation, while the latter on principle does not.' Thus the necessity for monetary compensation for loss suffered to an owner by police power restriction arises when restrictions are placed on property in order to create a public benefit rather than to prevent a public harm. [1 Rathkopf, op. cit., c. 6 at 6-7]
The statutory permissible critical area designation under attack; which seeks to protect the water quality and the surrounding ecosystem in the Central Pine Barrens, will prevent harm to the water and the environment. Hence, it constitutes a valid exercise of police power. See Just v. Marinette Cty., 56 Wis.2d 7, 201 N.W.2d 761 (Sup. Ct. 1972).
Appellants have not demonstrated that the restrictions render the land useless for all reasonable purposes. Washington Market Enterprises v. Trenton, 68 N.J. 107, 122 (1975). However, if it appears that some subject lands are devalued by the regulations, the tax assessors of the individual town are to consider the impact of the regulations on the true value of the land. See Cappture Realty Corp. v. Elmwood Pk. Bd. of Adj., 126 N.J. Super. 200, 217 (Law Div. 1973), aff'd 133 N.J. Super. 216 (App. Div. 1975).
The action of the Commissioner in designating the Central Pine Barrens as a "critical area" for sewerage purposes is affirmed.
NOTES
[1] "Ecosystem: An ecological community considered together with the non-living factors of its environment as a unit." Websters Third New International Dictionary (1961 ed.)