249 N.J. Super. 60 (1991)
591 A.2d 1362
NEW JERSEY BUILDERS ASSOCIATION, PLAINTIFF-APPELLANT,
v.
HELEN FENSKE, ACTING COMMISSIONER, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1991.
Decided June 18, 1991.
*62 Before Judges J.H. COLEMAN, DREIER and LANDAU.
George J. Tyler argued the cause for appellant (Giordano, Halleran & Ciesla, attorneys, George J. Tyler and Michael J. Gross, of counsel and on the brief, Patrick J. McNamara on the brief).
Valerie W. Haynes, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney, Mary C. Jacobson, Deputy Attorney General, of counsel, Valerie W. Haynes on the brief).
*63 The opinion of the court was delivered by LANDAU, J.A.D.
On September 6, 1989, following a year of public notice and extended opportunity for comment, the Department of Environmental Protection (DEP) adopted new comprehensive "Statewide Water Quality Management Planning Rules" acting under authority of the Water Quality Planning Act, N.J.S.A. 58:11A-1, et seq., the Water Pollution Control Act, N.J.S.A. 58:10A-1, et seq., and its general rulemaking powers set forth in N.J.S.A. 13:1D-9. The regulations were made effective October 2, 1989, but were corrected in part on July 2, 1990.
The New Jersey Builders Association (Association) is a trade association which represents several thousand developers, builders, realtors, suppliers, and others in the building industry. It brings this appeal to challenge certain provisions of those regulations, which it says exceed DEP's statutory grant of authority, deny equal protection of the law, and result in unconstitutional takings of property.
Before addressing the specific areas of the regulations complained of by the Association, it is helpful to review some of the statutory framework for water quality planning in the State.
Underlying much of the water quality planning process are the 1972 amendments to the Federal Water Pollution Control Act (FWPCA), 33 U.S.C.A. § 1251, et seq. The Act requires identification of areas with substantial water quality control problems and initiation of areawide Waste Treatment Management plans. 33 U.S.C.A. § 1288(a), (b).
In 1977, New Jersey adopted the Water Quality Planning Act, N.J.S.A. 58:11A-1, et seq., incorporating the following legislative findings:
The Legislature declares that the objective of this act is, whenever attainable, to restore and maintain the chemical, physical and biological integrity of the waters of the State, including groundwaters, and the public trust therein; and that areawide waste treatment management planning processes should be developed and implemented in order to achieve this objective and to assure adequate control of sources of water pollutants in the State. The Legislature further declares ... that the Department of Environmental Protection shall *64 conduct areawide waste treatment management planning for all areas of the State without a designated planning agency, and that said Department of Environmental Protection shall establish a continuing planning process which will encourage, direct, supervise and aid areawide planning and which will also incorporate water quality management plans into a comprehensive and cohesive Statewide program directed toward the achievement of water quality objectives; that the Department of Environmental Protection through the continuing planning process and the planning agencies through the areawide planning process shall coordinate and integrate water quality management plans with related Federal, State, regional and local comprehensive land use, functional and other relevant planning activities, programs and policies; and that opportunities for meaningful public participation shall be provided during all phases of the water quality planning management process.
N.J.S.A. 58:11A-2b.
N.J.S.A. 58:11A-7 requires that:
The commissioner shall conduct a continuing planning process which shall:
a. Integrate and unify the statewide and areawide water quality management planning processes;
b. Conduct a statewide assessment of water quality and establish water quality goals and water quality standards for the waters of the State;
c. Develop a statewide implementation strategy to achieve the water quality standards....
In addition, New Jersey adopted a Water Pollution Control Act, also administered by DEP. N.J.S.A. 58:10A-2. This provides for restoration, enhancement and maintenance of the State's waters, including ground and surface waters, and set up administrative controls respecting various treatment facilities.
Under the Water Quality Planning Act, the DEP is charged with implementing a continuing planning process to supervise areawide planning, and incorporating water quality management plans into the Statewide Plan, and coordinating such water quality management plans with Federal, State and local land use and planning activities. N.J.S.A. 58:11A-2. In particular, areawide waste treatment planning must be implemented to assure adequate control of water pollution sources. This includes monitorship of the areawide water quality management plans and identification of all political subdivisions necessary to construct, operate and maintain the facilities required by such plans. See N.J.S.A. 58:11A-5.
*65 Among the duties delegated to DEP under N.J.S.A. 13:1D-9, in connection with its overall mission to conserve natural resources, promote environmental protection and prevent pollution, are the following:
k. Supervise sanitary engineering facilities and projects within the State, authority for which is now or may hereafter be vested by law in the department, and shall, in the exercise of such supervision, make and enforce rules and regulations concerning plans and specifications, or either, for the construction, improvement, alteration or operation of all public water supplies, all public bathing places, landfill operations and of sewerage systems and disposal plants for treatment of sewage, wastes and other deleterious matter, liquid, solid or gaseous, require all such plans or specifications, or either, to be first approved by it before any work thereunder shall be commenced, inspect all such projects during the progress thereof and enforce compliance with such approved plans and specifications.
n. Enforce the State air pollution, water pollution, conservation, environmental protection, waste and refuse disposal laws, rules and regulations, including the making and signing of a complaint and summons for their violation by serving the summons upon the violator and thereafter filing the complaint promptly with a court having jurisdiction.
Important to an understanding of many current water quality problems, including those before us today, is the recent drying up of the substantial program of federal grants which initially provided the principal source of capital funds for construction of water quality facilities.
The significance of this problem is illustrated by another statute, not cited by either party, N.J.S.A. 58:27-1, et seq. There, in the "New Jersey Wastewater Treatment Privatization Act" the Legislature expressly found, "that during the last several years the amount of federal grant money available to states and local governments for assistance in constructing and improving wastewater treatment systems has sharply diminished; that the current level of federal grant funding is inadequate to meet the cost of upgrading the State's wastewater treatment capacity to comply with State water quality standards; that given this inadequate present level of federal grant funding, alternative methods of financing the construction, operation, and improvement of wastewater treatment systems must be developed and encouraged." The Legislature concluded *66 that one effective alternative means of financing necessary wastewater treatment systems would be to contract with private-sector firms for the financing, construction and operation of these systems. Thus, the statute provides that such private contracting for financing, design, construction, operation or maintenance of wastewater treatment systems or services may be entered into, "the provisions of any other law, or rules and regulations adopted pursuant thereto to the contrary notwithstanding...." N.J.S.A. 58:27-4. Under the Privatization Act, DEP must approve such proposed contracts pursuant to detailed statutory standards.

THE CHALLENGED REGULATIONS
The rules promulgated in 1989 are not entirely new, but reflect experience-motivated modifications to a program known as the 1985 Statewide Water Quality Management Program Plan. The 1985 Plan was prepared to comply with Federal Environmental Protection Administration requirements. Under 33 U.S.C.A. § 1315(b)(1), each state must have a continuing planning process approved by the EPA administrator. This requires, among other things, limitations upon effluents, schedules of compliance, and incorporation of the elements of all applicable areawide waste management plans. In order for a state to receive approval for assumption of the pollutant discharge permitting process, an approved continuing planning process is required. See also 33 U.S.C.A. § 1285(j).
The regulations under attack in this appeal are part of Title 7, Chapters 14A and 15 of the New Jersey Administrative Code, which supplanted the 1985 Statewide Water Quality Management Plan Program. Although the appeal is not subject to the 45-day time limitation of R. 2:4-1, and the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., provides no such time limitation for challenge, we have not ignored the fact that the substantially similar requirements in the 1985 Plan have been in effect for a number of years without challenge.

*67 The Co-Permittee Requirement

Three areas of objection to the new rules have been singled out by the Association. The first concerns N.J.A.C. 7:15-4.1 and 7:14A-2.1(l), (m), (n) and (o). This group of rules require that all applications by private parties for New Jersey pollution discharge elimination system permits must be favorably endorsed, accepted and approved by resolution of the governing body of the municipality in which discharges will be located, and by the sewerage authority whose service area includes the site where the discharge requiring a pollutant discharge elimination system (NJPDES) permit is located. Permittees are subject to rigorous reporting and monitoring requirements. Of primary concern to the Association is the further requirement exemplified by N.J.A.C. 7:15-4.1(a) that: "(a) After December 5, 1985, the Department shall not, except as provided in (c) below, issue a permit under N.J.A.C. 7:14A for the following new or expanded DTW [Domestic Treatment Works] unless a governmental entity or sewerage agency is either the sole permittee or co-permittee under N.J.A.C. 7:14A for that DTW." There are certain exceptions to the rule which need not now be addressed.
The Association says that DEP's adoption of the co-permittee requirement exceeds the statutory authority delegated in the Water Quality Planning and Water Pollution Control Acts. It also urges that the DEP is thus compelling governmental entities to violate the anti-donative provisions of the New Jersey Constitution. (New Jersey Constitution, Art. 8, § 3, ¶ 2). The Association further argues that, apart from these defects, the co-permittee requirement will place a powerful anti-Mount Laurel weapon in the hands of municipal entities which seek ways to impede construction of low-income housing in their localities.
Finally, says the Association, adoption of the co-permittee regulation was arbitrary, capricious and unreasonable.
*68 We are constrained to agree with the Association that DEP has exceeded the legitimate scope of its statutory rulemaking delegation in adopting this aspect of the new regulations. Under the new regulations, the DEP will not issue a permit for most new or expanded domestic treatment works unless a government entity or sewerage agency is either the sole permittee or a co-permittee. See N.J.A.C. 7:15-4.1; N.J.A.C. 7:14A-2.1(l), (m), (n), (o). We recognize that all administrative regulations must be accorded a presumption of reasonableness and a rebuttable presumption of validity. A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't., 90 N.J. 666, 683, 449 A.2d 516 (1982). Findings of ultra vires action are disfavored. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978). Nonetheless, administrative regulations which are inconsistent with delegated legislative powers must be deemed invalid.
Here, the DEP has unilaterally undertaken to give new powers and impose new responsibilities upon various municipal entities which are themselves only creations of the Legislature. We use the phrase "municipal entities" to include authorities, and county and local governments.
The DEP argues that "[T]he most technically advanced DTW will eventually malfunction if not properly operated and maintained. The NJPDES permitting and penalty process addresses the DTW at the planning stage and then, if necessary, at the malfunction stage. Experience has shown that that is not enough ... to avoid reaching the penalty phase is far preferable, and requires a sub-state entity with expertise in wastewater management to oversee the functioning of the DTW. DEP does not have this capability." (Emphasis supplied).
The reason for the co-permittee requirement is described by DEP as follows:
The co-permittee requirement was imposed by regulation after the DEP had years of experience that demonstrated the problems that can arise when private entities undertake to provide sewerage service. Even the most financially sound private parties can suffer reverses and seek protection in bankruptcy. *69 Should this occur, the Department's experience indicates that it may take years to resolve and achieve a properly functioning system. Only public entities are certain to be available for the long term.
In short, DEP desires to use the co-permittee requirement to insure proper oversight, by responsible and experienced governmental bodies, of the operations of domestic treatment works to insure that water pollution will not worsen and that permit holders comply with the terms of their permits. Secondly, DEP requires that those governmental entities will be there to take charge and bring the facilities back into compliance expeditiously if the private permit holder should prove incompetent or become insolvent.
DEP urges that this need not subject the municipal entities to any unexpected liabilities. They suggest that such exposure can be limited by appropriate bonding and other financial agreements between the private entity and the public entity, and by diligent oversight. However, all permit holders are subject to the panoply of statutory remedies and penalties. See, e.g., N.J.S.A. 58:10A-10. Moreover, many municipalities do not have any expertise in water management. Thus, a more comprehensive legislative approach is required.
We see the DEP co-permittee regulation as an attempt to cope with its admitted inability (undoubtedly owing to insufficient resources) to fulfill adequately its statutory obligations under N.J.S.A. 13:1D-9k and 13:1D-9n to supervise sanitary engineering facilities within the State, and to enforce compliance with approved plans and specifications and the State's pollution and environmental protection laws. Such a profound shift of fiscal and prime regulatory responsibility, however, cannot be made by an administrative agency. Implicated here are problems which transcend efficient water and pollution management. There are fiscal, intragovernmental, and ultimately, planning and development issues involved as well.
We have canvassed the authorities cited to us, and some not cited, in an attempt to find legislative support for DEP's requirement that local governments or agencies go on the line *70 fiscally and in terms of technological staffing to underwrite the performance of non-public treatment facilities. We can find no such authority. DEP has cited to us, only in the most general terms, its rulemaking authority. While these are unquestionably broad, they cannot create new powers or new duties for municipal entities. This is a function of the Legislature.[1]
Such powers and duties can be created only by statutes such as the Sewerage Authorities Law, N.J.S.A. 40:14A-1, et seq.; the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1, et seq.; Title 40 legislation respecting municipalities and counties, or other general legislation.
Ironically, the Legislature has already expressly recognized the important role to be borne by local governments and authorities in maintaining and improving water quality. See N.J.S.A. 58:27-2, set forth above. It has also there recognized that both the federal and state governments, as well as local governments, have limited sources of revenues. Id. Accordingly, the Legislature has specifically authorized, as an alternative method of financing necessary wastewater treatment systems, the option to contract with private-sector firms for the financing, construction and operation of such systems. N.J.S.A. 58:27-1, et seq.
It is difficult to reconcile this legislative response to the funding dilemma by reliance upon privatization, with the DEP regulatory response to the same problem which requires that the same strapped local governmental entities must furnish the ultimate financial and technical support to guarantee performance by the very private firms which were supposed to offer a *71 source of funds and expertise presently unavailable to those local bodies.[2]
Clearly a cohesive governmental program is required to address the developing threat to the health and safety of our water environment. But the executive and legislative branches must together set forth where primary responsibility for water quality and pollution management shall lie, and decide whether securing municipal entity participation and imposing ultimate responsibility upon such entities is the only way private utilities can receive DEP permits.
The closest analogous statutory basis for the challenged copermittee regulations which we have found is in N.J.S.A. 40:14B-20(15), which gives power to a county or municipal utility authority to extend credit or make loans to "any person" for the acquisition, construction and operation of a solid waste, sewerage treatment or wastewater treatment or collection system. This legislation, however, only points up the need for specific legislative delegation of analogous powers, such as endorsing and participating as a co-permittee with private entities. Certainly N.J.S.A. 40:14B-20(15) falls short of providing those powers. The specificity of all other power delegations by the Legislature in this area makes it clear that such additional powers cannot be inferred. Even cooperation with other public entities has had to be specifically authorized. See, e.g., N.J.S.A. 40:14B-24. However, when the Legislature intended to give an administrative agency powers with respect to a function of local government, it has so indicated by enactment of a specific statute. Jersey City Incin. Auth. v. Dept. of Pub. Util., 146 N.J. Super. 243, 369 A.2d 923 (App.Div. 1976), certif. granted, 74 N.J. 257, 377 A.2d 662 (1977), appeal dismissed, 75 N.J. 600, 384 A.2d 830 (1978). In the Jersey City Incinerator case, we considered whether the former Department of Public Utilities could compel a municipal corporation to continue to *72 operate a utility, an order which directly involved the fiscal affairs of the municipality. We said, "A grant of such power is not to be lightly implied. It must be firmly anchored in some clear legislative delegation of jurisdiction." Id. 146 N.J. Super. at 256, 369 A.2d 923. See also, as to need for specific legislative authorization, Browning-Ferris v. City of Passaic, 116 N.J. 83, 90, 560 A.2d 1208 (1989); Darrah v. Township of Evesham, 111 N.J. Super. 62, 65-66, 267 A.2d 70 (App.Div. 1970).
We must declare invalid, absent specific legislative authorization, those portions of N.J.A.C. 7:14A-2.1(l), (m), (n), (o) and 7:15-4.1, by which DEP purports to empower and require local governmental bodies to participate with private utilities as co-permittees in order to ensure performance. Pending legislation may provide such authorization, but this is unclear as of the date we write.
By reason of this holding, it is not necessary for us to reach the serious question raised on appeal whether such endorsement or co-permittee participation, if otherwise valid, would violate the anti-donative and anti-credit loan provisions of the New Jersey Constitution, Art. 8, Sec. 3, ¶ 2 and ¶ 3. Similarly, we do not consider the arguments that by merely declining to enter into co-permittee or endorsement arrangements, local entities will be able to block Mt. Laurel development. See, however, N.J. Bldrs. v. Dept. of Environmental Protec., 169 N.J. Super. 76, 404 A.2d 320 (App.Div.), certif. denied, 81 N.J. 402, 408 A.2d 796 (1979), where we considered a similar argument, and recognized that legitimate environmental constraints must be balanced against Mt. Laurel considerations.

The Wastewater Management Plan Requirement
The Association next attacks N.J.A.C. 7:15-5.1, et seq., as exceeding the statutory authority vested in DEP. These regulations require development of local wastewater management plans. As a result of federal and State statutory action, it is required that areawide waste treatment management plans *73 be developed. See, e.g., 33 U.S.C.A. § 1288; N.J.S.A. 58:11A-7. The water management plan technique set forth in the regulation is intended to facilitate the updating or amendment of water quality management plans so that they are not static. Where significant amendments in existing areawide water quality management plans are intended such as, for example, construction of new domestic treatment works or expansions of capacity which fall within the stipulated quantity or area impact, it is required that the areawide water quality management plan be submitted in a specific format denominated a wastewater management plan.
We have considered carefully the comments and responses of record, the statutory authority, and the briefs and arguments of counsel. These lead us to conclude that the Association's challenge to N.J.A.C. 7:15-5.1, et seq., requirements for local wastewater management plans is clearly without merit. R. 2:11-3(e)(1)(E). We add our recognition that authority for such regulations is sufficiently provided by statutes such as N.J.S.A. 58:11A-2; N.J.S.A. 58:11A-5; N.J.S.A. 58:11A-7; N.J.S.A. 58:11A-9; N.J.S.A. 58:11A-10; N.J.S.A. 58:11A-16; and N.J.S.A. 13:1D-9g, h and k.
We agree with the DEP that the wastewater management plan device created by its regulations is merely a mechanism for making amendments to areawide water quality management plans, and that this is clearly within its statutory authority. The measured reasonableness of DEP's approach in this regard is further pointed up by the exemptions in N.J.A.C. 7:15-5.1(b) for projects with less than 10 acres or which generate less than 20,000 gallons per day of wastewater, as well as projects that are already considered in areawide water quality management plans.

The Timetable
The third subject of objection by the Association is N.J.A.C. 7:15-5.23 which sets forth a schedule for submission of water *74 management plans and standards for establishment of alternate schedules. Significantly, it also provides that it is possible for a water management plan to be submitted ahead of the designated schedule upon written request. The regulation staggers the submission dates in order to equalize workload in the DEP as well as for consultants to wastewater management planning agencies.
We are satisfied that the timetable contained in N.J.A.C. 7:15-5.23 gives rise neither to a denial of equal protection nor to an unconstitutional taking of property under New Jersey or United States Constitutions.
In Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 37-38, 364 A.2d 1016 (1976), cert. denied sub nom., Feldman v. Weymouth Tp., 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977), the Court addressed the applicable standards under the Federal Constitution:
The federal equal protection clause does not require that government treat all persons identically. It requires only that differences in treatment of persons similarly situated be justified by an appropriate state interest; such distinctions may not be irrational or discriminate invidiously. (citations omitted). Under the conventional "two-tiered" analysis applied by the United States Supreme Court, the burden is on the party attacking the classification to show that it lacks a rational relationship to a legitimate state objective. The notable exception to this test occurs in situations where the classification involves "suspect" criteria or impinges upon "fundamental" rights. In these cases the burden is on the state to show that the classification serves a "compelling state interest." (citations omitted).
The only rights which are "fundamental" in this regard are those expressly guaranteed or clearly implied by the federal constitution. (citation omitted).
There have been no assertions that "fundamental rights" or "suspect criteria" are here implicated. Essentially, the Association's equal protection argument is that the staggered submission schedule bears no rational relationship to a legitimate state interest, and indeed that there is no legitimate state interest to foster.
The latter argument is based on the Association's position that the wastewater management plan regulations are invalid. *75 As we have already rejected that contention, the argument fails.
As to the rational relationship of the timetable to the plan filing requirements, we find entirely plausible DEP's explanation that workload would be unmanageable if all wastewater management plans were submitted at once, to be followed by six years of relative inactivity, and then by another deluge of applications. Moreover, DEP has pointed out that the schedule is not ironclad and that provision has been made for submission ahead of schedule in accordance with N.J.A.C. 7:15-5.23(f), (g) and (j). DEP has further observed:
Table I in N.J.A.C. 7:15-5.23(c) also provides adequate time to determine which municipalities have wastewater management plan responsibility under N.J.A.C. 7:15-5.8, and serves to reduce duplication of wastewater management planning effort. Particular counties were assigned to particular workload each year, taking into account population projections (rapidly growing counties tend to have more complex wastewater planning issues), the location of the county (Department staff who review wastewater management plans are organized by geographic region), and the presence or absence of county utility authorities (whose wastewater management plan schedule is governed by N.J.A.C. 7:15-5.23(b) rather than by Table I).
This explanation is most reasonable. We note the Association's contention that there are provisions for local endorsements which might give effective "veto" power to local governmental entities as well as to DEP. However, a water quality management plan may still be adopted even if there is no endorsement. As to the DEP itself, the requirement is entirely consistent with its statutory duties.
We disagree, too, with Association's contention that there is a de facto moratorium created by the timetable, which constitutes a temporary taking of property in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Art. I, ¶ 1 and ¶ 20 of the New Jersey Constitution.
To begin with, as pointed out above, the timetable is not an absolute bar to earlier submission and approval of a plan. Moreover, the timetable regulation will not deprive persons of all use of their property, even temporarily. Further, it is *76 simply incorrect to assert that there is a "clearly indefinite" deprivation of property use. The geographical order of proceeding assigned has been reasonably explained, and all persons within the same geographical units receive similar treatment. Moreover, no development which is inconsistent with an areawide water quality management plan would be legal, irrespective of the timetable. In other words, there are existing restrictions upon development as part of the water quality planning process, and no development already consistent with areawide plans will require a wastewater management plan approval nor an amendment to the areawide water quality management plan.
We are satisfied that the N.J.A.C. 7:15-5.23 timetable meets the standards we established in Rieder v. State Dept. of Transp., 221 N.J. Super. 547, 554, 535 A.2d 512 (App.Div. 1987). We do not perceive First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) to be here applicable. See also Lom-Ran v. Dept. of Environmental Protection, 163 N.J. Super. 376, 385, 394 A.2d 1233 (App.Div. 1978); N.J. Bldrs., supra, 169 N.J. Super. at 96, 404 A.2d 320.

CONCLUSION
N.J.A.C. 7:15-4.1 and N.J.A.C. 7:14A-2.1(l), (m), (n) and (o) shall be modified to delete the co-permittee requirements. The regulations under review are in all other respects declared valid and constitutional.
Mindful of the presently ongoing legislative process, however, we stay the effective date of our decision respecting the governmental co-permittee requirements of N.J.A.C. 7:15-4.1 and N.J.A.C. 7:14A-2.1(l), (m), (n) and (o) until September 15, 1991. The present text of A-3560 recognizes the existing DEP requirements for local agency or municipal co-permittees. Should this or substantially identical legislation be enacted, it would implicitly ratify those portions of the regulations which *77 we have deemed invalid for want of legislative authorization. That portion of the opinion would thus be rendered moot.
In fairness to the litigants, we do not consider it appropriate to delay further this decision pending uncertain legislative action.
NOTES
[1] We take notice that there is presently pending in the Assembly, Assembly Committee Substitute for A-3560, which has undergone several amendments since introduction. The bill, if adopted, would provide legislative authorization for a different kind of co-permittee approach pursuant to its comprehensive provisions. Among other things, it would establish a "New Jersey Wastewater Warranty Corporation," with authority to issue bonds, and to support and assist in wastewater treatment. As presently drafted, A-3560 would not become effective until 90 days after enactment.
[2] The proposed A-3560 would address this problem with a different approach.