793 A.2d 773

IN RE ADOPTED AMENDMENTS N.J.A.C. 7:15–8.

Superior Court of New Jersey
Appellate Division

Argued March 6, 2002—Decided March 18, 2002.

Before Judges CONLEY, A.A. RODRÍGUEZ and LISA.

*Paul H. Schneider* argued the cause for appellants New Jersey Builders Association, Utility & Transportation Contractors Association of New Jersey, New Jersey Association of Realtors, *and* New Jersey Concrete & Aggregate Association *(Giordano, Halleran & Ciesla,* attorneys; *Michael J. Gross,* of counsel; *Mr. Schneider* and *Steven M. Dalton,* on the brief).

*Daren R. Eppley,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection *(David Samson,* Attorney General, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Mr. Eppley,* on the brief).

*Susan J. Kraham* attorney for amici curiae New Jersey Future, Inc., and New Jersey Conservation Foundation on the brief.

The opinion of the court was delivered by

CONLEY, P.J.A.D.

Here is how the appellant presents the procedural context of this appeal:

> On July 3, 2000, the Department of Environmental Protection ("DEP") proposed "to repeal the Water Quality Management Planning Rules at *N.J.A.C.* 7:15 and replace them with new Water Quality and Watershed Management rules at the

same citation...." 32 *N.J.R.* 2285(a), 2286 (July 3, 2000). *The proposal filled 78 pages of doubled column, fine print in the New Jersey Register, of which 35 pages represented the text of the proposed new rules and the remainder [of] DEP's explanation and analysis of its proposal.* 32 *N.J.R.* 2285 to 2363....

Following the public hearings and the receipt of written comments, DEP decided that rather than repeal the existing rules, as it had proposed, it would instead "amend [the proposal]." DEP did this *by taking one small fraction of the proposed new rules (filling little more than one half page in the New Jersey Register), [and] modifying that fragment,* and adopting this as an "amendment" to the existing rules that had been proposed for repeal. 33 *N.J.R.* 697(a) (February 20, 2001).

[Emphasis added.]

In our view, this is an accurate depiction. The proposed repeal of DEP's existing "Water Quality Management Planning Rules" (WQM) and replacement with an entirely new and broadly more comprehensive "Water Quality and Watershed Management Rules" was described by DEP in the noticed proposal as a "sea change" in clean water policy, a "comprehensive," "holistic" and "coherent" new regulatory scheme. That each part of the new scheme was intended to be related to the whole is reflected by the fact that every proposed subchapter, except subchapter 3, contains cross-references to the other subchapters. Appellants asserted that there are "close to 100 separate cross-references between the various subchapters. 32 *N.J.R.* at 2328 through 2361." This assertion has not been denied by the DEP and, indeed, appears to be accurate.

 Now, before us, in the face of appellant's challenge to the adoption of but a small part of the overall proposal without republication and notice, DEP contends the proposed regulations were not a cohesive, integrated and interdependent scheme, but rather that what was proposed was simply a collection of "separate, distinct regulatory initiatives," each standing independently of the other such that an adoption of one of those initiates was not a substantial change in what was proposed. In our view, this is not an accurate depiction. We reverse DEP's adoption of *N.J.A.C.* 7:15–8 without a "new notice of proposal and public opportunity to be heard" required under *N.J.A.C.* 1:30–6.3(a).[1]

---

[1] Appellants raise, as well, substantive challenges to the adopted rule to which both *amici* and DEP respond. We do not address these contentions as the new

WQM plans are part of a state's federal mandate under the Water Pollution Control Act, 33 *U.S.C.A.* §§ 1251 to 1387, in order to obtain federal funding. 33 *U.S.C.A.* § 1288. *See Toll Bros., Inc. v. N.J. Dept. of Envt'l Prot.,* 242 *N.J.Super.* 519, 526, 577 *A.*2d 845 (App.Div.1990). In 1977, the Legislature adopted the Water Quality Planning Act, *L.* 1977, *c.* 75, *N.J.S.A.* 58:11A–1 to –16, as well as the Water Pollution Control Act, *L.* 1977, *c.* 74, then *N.J.S.A.* 58:10A–1 to –20 [2]. Both acts form part of DEP's overall mandate to regulate water supply and water quality in the State. *See New Jersey Builders Ass'n v. Fenske,* 249 *N.J.Super.* 60, 64, 591 *A.*2d 1362 (App.Div.1991).

Pursuant to this legislative authority, in 1989, DEP repealed existing rules for WQM plans and replaced them with a new regulatory scheme. *Id.* at 63, 591 *A.*2d 1362. Because the challenged rule here focuses upon septic dependent developments, we briefly characterize the regulation of such developments under the 1989 regulations. Prior to the adoption of *N.J.A.C.* 7:15–8, a development of forty-nine or less residential units could utilize septic systems. *N.J.A.C.* 7:15–4.4; 21 *N.J.R.* 3164 (October 2, 1989). For such developments that were within a designated sewer services area, septic systems for individual residences were excepted, provided that such residences would tie into a sewer system when it became available. *N.J.A.C.* 7:15–4.4(a), (b); 21 *N.J.R.* 3164 (October 2, 1989). For such developments outside a designated sewer service area, the 1989 rules merely required that the maps filed in connection with the plan depict areas, which would be served by septic systems. *N.J.A.C.* 7:15–5.18(c)(6)(i), (c)(7)(i); 21 *N.J.R.* 3169 (October 2, 1989).

---

notice and opportunity to be heard may yield a different result. We do note, however, the dubious validity of the contentions and were we to confront them, they would be rejected.

[2] The Act has been subject to numerous amendments, including provisions regulating underground storage tanks containing hazardous substances, *N.J.S.A.* 58:10A–21 to –43, and provisions regulating ocean dumping, *N.J.S.A.* 58:10A–44 to –60.

The rules at issue here were originally proposed as subchapter 6 in the "sea change" proposal. 32 *N.J.R.* 2307 (July 3, 2000). Under the 1989 rules, DEP had "allowed for general service area designation . . ." of septic based systems that discharged less than 20,000 gallons per day (gpd) into groundwater; DEP proposed to withdraw those general wastewater service area designations and replace them with "individual service area designations for wastewater treatment facilities . . . that discharge more than 2,000 gpd and less than 20,000 gpd to ground water and a general service area designation for the remaining area for all new discharges to groundwater of less than 2,000 gpd." *Ibid.* The proposal would have required "*all* new developments associated with wastewater discharges of greater than 2,000 gpd, including residential developments totaling six or more dwelling units and expansions to existing facilities that have not previously assessed environmental impacts, to assess the impacts associated with that development through a modification to the areawide WQM plan." *Ibid.* (emphasis added). The rule that was adopted applies only to such proposed developments that are located outside of designated sewer service areas. For those septic-dependent developments, an amendment to the applicable WQM plan is required before proceeding with development. 32 *N.J.R.* 2308 (July 3, 2000).

Of course, since the developments at issue here were not, for the most part, subject to compliance with WQM requirements and the procedural aspects of the proposed rules have been withdrawn, what compliance procedures such developments must now follow are undefined in regulatory fashion. Indeed, DEP acknowledges that the existing rules which it determined not to replace, on to which the newly included septic-reliant developments have been grafted, provide "minimal detail" with regard to the procedural and substantive criteria for review of plan amendments. 32 *N.J.R.* 2287 (July 3, 2000). DEP, acknowledging this deficiency, stated that criteria for review of plan amendments for projects on septics will be determined on a "case-by-case" basis, 33 *N.J.R.* 710 (February 20, 2001), and that DEP "will be developing" guidance for this purpose, 33 *N.J.R.* 698 (February 20, 2001). In answers

to frequently asked questions, DEP advised developers affected by the new rules to contact their local planning agencies, who were being "provided with guidance and training on how to implement this new subchapter so they will be able to assist you directly." [3]

We have recently pointed out that:

> Agencies are accorded "wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction." *Metromedia, Inc. v. Dir. Div. of Tax.,* 97 *N.J.* 313, 333, 478 *A.*2d 742 (1984). "[A]dministrative agencies possess the ability to be flexible and responsive to changing conditions." *In re Pub. Serv. Elec. and Gas Co. Rate Unbundling,* 167 *N.J.* 377, 385, 771 *A.*2d 1163 (2001) (citation omitted). "This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." *Ibid.* In that regard, "[a]n agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty...." *Northwest Covenant Med. Ctr. v. Fishman,* 167 *N.J.* 123, 137, 770 *A.*2d 233 (2001).
>
> [*Coalition For Quality Health Care v. New Jersey Dep't of Banking & Ins.,* 348 *N.J.Super.* 272, 294, 791 *A.*2d 1085 (App.Div.2002).]

But where, as here, the agency proposes to act in a rule-making capacity, the procedural requirements of the Administrative Procedure Act must be complied with *N.J.S.A.* 52:14B–4(d). These requirements include notice and an opportunity to be heard. *N.J.S.A.* 52:14B–4(a)(1),(2); *Woodland Private Study Group v. State, Dep't of Envtl. Prot.,* 109 *N.J.* 62, 63–64, 533 *A.*2d 387 (1987). The essential purpose of these requirements "is to give those affected by the proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as 'a means of informing regulators of possibly unanticipated dimensions of a contemplated rule.' " *In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C.* 7:27–23, 239 *N.J.Super.* 407, 411, 571 *A.*2d 971

---

[3] When DEP withdrew its proposal to adopt all but proposed subchapter 6 (*N.J.A.C.* 7:15–8), it indicated an intent to "finalize for adoption or reproposal the remaining portions ..." of the rules no later than July 2, 2001, for publication on August 6, 2001. 33 *N.J.R.* 698 (February 20, 2001). However, DEP has adopted only proposed subchapter 10, which sets standards for funding watershed management groups. 33 *N.J.R.* 2641 (August 6, 2001). The remaining proposed subchapters have expired. *Ibid.*

(App.Div.1990) (quoting *Am. Employers' Ins. Co. v. Comm'r of Ins.*, 236 *N.J.Super.* 428, 434, 566 *A.*2d 202 (App.Div.1989)).

Thus, *N.J.A.C.* 1:30–6.3(a) states:

> Where, following the notice of proposal, an agency determines to make changes in the proposed rule which are so substantial that the changes effectively destroy the value of the original notice, the agency shall give a new notice of proposal and public opportunity to be heard.
>
> [*Ibid.*]

Substantial changes in a rule as proposed and as adopted, then, require "new notice of proposal and public opportunity to be heard."

A change is likely to be substantial if the rules as adopted:

> 1. Enlarge or curtail who and what will be affected by the proposed rule;
>
> 2. Change what is being prescribed, proscribed or otherwise mandated by the rule;
>
> 3. Enlarge or curtail the scope of the proposed rule and its burden on those affected by it.
>
> [*N.J.A.C.* 1:30–6.3(b).]

Changes which are not substantial include:

> 1. Spelling, punctuation, technical, and grammatical corrections;
>
> 2. Language or other changes, whose purpose and effect is to clarify the proposal or correct printing errors; and
>
> 3. Minor substantive changes which do not significantly enlarge or curtail the scope of the rule and its burden, enlarge or curtail who or what will be affected by the rule, or change what is being prescribed, proscribed or mandated by the rule.
>
> [*N.J.A.C.* 1:30–6.3(c).]

Facially applied, these standards clearly depict *N.J.A.C.* 7:15–8 as a substantial change from what was proposed. It curtails the universe of those to be affected under the original proposal (*N.J.A.C.* 1:30–6.3(b)(1)), it changes the original "sea change" approach (*N.J.A.C.* 1:30–6.3(b)(2)), and it curtails the scope of the original proposal and its burdens (*N.J.A.C.* 1:30–6.3(b)(3)). The change in what was adopted from what was proposed was, further, neither a spelling, punctuation, technical or grammatical change (*N.J.A.C.* 1:30–6.3(c)(1)), nor a clarification language change (*N.J.A.C.* 1:30–6.3(c)(2)).

■ We have said that to determine whether new notice and public opportunity to be heard is required, we "must focus on whether the changes destroyed the value of the original notice." *In re Adoption of N.J.A.C.* 9A:10–7.8(b), 327 *N.J.Super.* 149, 156, 742 *A.*2d 997 (App.Div.2000) (new notice and public opportunity to be heard was not required where there was no discernable difference in the essential language of the proposal and the adoption). But:

Obviously, too restrictive a construction of the applicable rule-making principles would, in effect, discourage an agency from making changes in response to comments. The proper construction of these principles should not condemn a responsive agency, that wishes to modify its proposed action because of comments received, to indefinite and endless re-proposals.

[*Id.* at 155, 742 *A.*2d 997.]

And, "[w]hen an agency changes its proposed rule in response to an objection, later argument, by the same objector, that the change destroyed the value of the original notice should be carefully scrutinized." *Id.* at 156, 742 *A.*2d 997. *Compare In re Adoption of Amendments to N.J.A.C.* 7:27–16, 244 *N.J.Super.* 334, 346–47, 582 *A.*2d 824 (App.Div.1990) (change in proposed rule was at the insistence of the appellant and thus new notice and public opportunity to be heard not required); *Soc'y for Envtl. Econ. Dev. v. N.J. Dept. Envtl. Prot.,* 208 *N.J.Super.* 1, 8, 504 *A.*2d 1180 (App.Div.1985) (change in proposed rule was in the effective date of a rule and, thus, merely a clarification, not a substantial change requiring new notice and public opportunity to be heard); *In re Appeal of Adoption of N.J.A.C.* 7:7A–1.4, 240 *N.J.Super.* 224, 228, 573 *A.*2d 162 (App.Div.1989), *rev'd on other grounds,* 118 *N.J.* 552, 573 *A.*2d 143 (1990) (change of the definition of the term "swale" was not significant and did not require new notice and public opportunity to be heard not required); *In re Regulation of Operator Serv. Providers,* 343 *N.J.Super.* 282, 336, 778 *A.*2d 546 (App.Div.2001) (no change in the text of the adopted regulation and, thus, new notice and public opportunity to be heard), *with In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C.* 7:27–23, *supra,* 239 *N.J.Super.* at 414, 571 *A.*2d 971 (change curtailing the universe of those

affected and burdened was substantial and required new notice and opportunity to be heard).

As we are convinced the latter was correctly decided and is analogous here, we discuss it in some detail. In *In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C. 7:27–23, supra,* a proposed rule that was to have applied to all air fresheners and insecticides was modified to apply only to all non-disinfectant air fresheners containing more than fifty percent of volatile organic substances, which affected only four consumer products. 239 *N.J.Super.* at 410, 571 *A.2d* 971. It was adopted without new notice and public opportunity to be heard. We concluded:

> In our view, the changes which were made in the rule between proposal and adoption significantly "curtail who and what will be affected by the proposed rule"; "change what is being proscribed", and "enlarge the burden on those affected" by the rule. *N.J.A.C.* 1:30–4.3(a)(1), (2) & (3). The changes are not technical, insubstantial alterations but strike at the heart of the rule itself. In short, the value of the original notice of rule-making was abrogated by the substantial alteration of the rule between proposal and promulgation. *N.J.A.C.* 1:30–4.3(a). This is exactly what the A.P.A. intended to avoid.
>
> [*Id.* at 414, 571 *A.2d* 971.]

We depicted the underlying facts thusly:

> The rule, as proposed, applied to air fresheners and consumer insecticides and was specifically posited upon the anticipated reduction of 3300 tons of VOS emissions (approximately 1300 from air fresheners and disinfectants and 2000 from consumer insecticides) beginning in 1990 and culminating in 1994 when the reduction of VOS to 5% by weight came into effect. Because of the manner in which the reductions were staged—to 50% in 1990, to 25% in 1992, and to 5% in 1994—the number of affected products was expected to increase as each plateau date was reached, with the entire air freshener/insecticide industry affected by the 1994 target date. Even as proposed, the reduction of total VOS emissions was modest—8% of the consumer product VOS emissions and one-half of one percent of all VOS emissions by 1994.
>
> [*Id.* at 412–13, 571 *A.2d* 971.]

Thus, we said:

> As adopted, the rule dramatically lessened DEP's projected reduction in VOS tonnage. According to the DEP proposal and based on the SAIC surveys, insecticides account for 2000 of the projected 3300 ton reduction. Of the 1300 tons attributable to air fresheners and disinfectants, only 45% or 585 tons will be eliminated in 1990. From that reduction the elimination of the disinfectant air

freshener from the scope of the rule must be accounted for. In short, the effect of the proposal was significantly curtailed in the adopted rule.

[*Id.* at 413, 571 *A.2d* 971.]

The curtailment here of those affected and of those burdened by the adopted rule as opposed to those to be affected and burdened by the proposed rule is not analytically distinguishable. It is undisputed that the proposed rule included septic-dependent developments throughout the state of six or more units. The adopted rule applies only to such septic-dependent developments located outside of designated sewer service areas. Appellants argue that, as a result, "developers outside of sewer service areas will be subject to significant burdens while those within sewer service areas will escape these requirements." DEP asserts that this is not a significant curtailment in those to be burdened because the "overwhelming majority of developments utilizing septic systems are located outside sewer service areas." Appellants dispute this assertion, arguing that had the "notice of the proposed rule informed the public that DEP would adopt a rule such as this, appellants would have presented data and information during the public participation process addressed to this issue." We cannot tell from the regulatory procedures used here whether this is so. But it is clear that the change reduces the scope of those to have been affected by the proposed rule, imposing its burdens on a reduced universe of developers.

Critically, too, in the proposed rules, DEP had promised to "streamline" the procedures and standards for compliance with the new regulatory requirements. This did not occur in the adopted rules. As a result, "developers of small projects on septics located outside of a sewer service area will be subject to the costs and delay associated with the [existing] WQM process without any of the benefits of the provisions of the proposed rule ..." intended to streamline the process. DEP responds that developers utilizing septic disposals "will now be required to conduct the same analyses required of developers utilizing local or regional sewer collection systems." Appellants counter that the rule as adopted deletes an entire subchapter in the proposed rules

as to how septic-reliance development would be regulated. Appellants claim that "the significance [of this change] is great as it eliminates the proposed standards and procedures that were part and parcel of the proposal to regulate small-scale developments on septics." We agree. The procedural aspects of the new regulatory scheme were not adopted, leaving the newly regulated septic system developers to comply with an entirely different, and perhaps not fully known, procedural process. How could that not be a substantial change in the initial proposal?

This consideration of the changes between proposed subchapter 6 and adopted subchapter 8 (*N.J.A.C.* 7:15–8), of course, is wholly aside from the fact that by its adoption only, DEP changed entirely the scope of the initial proposal. As we have said, that proposal was to repeal the entire regulatory scheme, of which septic-dependent developments form a tiny part. It was to replace the scheme with an entirely new and different approach. What was finally adopted bore no resemblance whatsoever to the "comprehensive," "holistic" and "coherent" proposal. It seems obvious just from this that the adopted rule was a significant change from the noticed proposal to which the public responded. In our view, there has not been public opportunity to be heard on the adoption of *N.J.A.C.* 7:15–8.

█ Finally, we comment briefly on the claim that we should presume the procedural regularity of the rule adoption because the Office of Administrative Law (OAL) approved publication of the adoption of the rule as modified without new notice and public opportunity to be heard. We have said that we will "respect the OAL's expertise in rule-making and acknowledge its vigilance in protecting public access to agency rule-makings" where that office advises an agency that no republication is required. *See generally, In re Adoption of N.J.A.C.* 9A:10–7.8(b), *supra,* 327 *N.J.Super.* at 158, 742 *A.*2d 997. However, in that case, the agency specifically asked the OAL whether the proposed amendment might require reproposal, and the OAL responded in the negative. *Id.* at 153, 742 *A.*2d 997. Those are not the circumstances here. More-

over, where procedural irregularity is as clear as it is here, no amount of deference to the OAL should preclude us from so declaring.

The adoption of *N.J.A.C.* 7:15–8 is reversed and remanded for a new notice and public opportunity to be heard.