571 A.2d 971

IN THE MATTER OF THE ADOPTION OF REGULATIONS
GOVERNING VOLATILE ORGANIC SUBSTANCES IN
CONSUMER PRODUCTS, N.J.A.C. 7:27–23.

Superior Court of New Jersey
Appellate Division

Argued January 30, 1990—Decided February 26, 1990.

Before Judges PRESSLER, LONG and LOWENGRUB.

*George J. Tyler* argued the cause for appellant Scott's Liquid Gold, Inc. (*Giordano, Halleran & Ciesla,* attorneys; *Michael J. Gross, George J. Tyler* and *Steven M. Berlin,* of counsel and on the brief).

*Paul H. Schneider,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*Robert J. Del Tufo,* Attorney General, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel; *Paul H. Schneider,* on the brief).

The opinion of the court was delivered by

LONG, J.A.D.

On August 15, 1988, in response to an order of the United States District Court (*American Lung Ass'n of N.J. v. Kean,* 670 *F.Supp.* 1285 (D.N.J.1987), aff'd 871 *F.*2d 319 (3rd Cir. 1989)) establishing a schedule for the promulgation and implementation of regulations controlling the emissions of volatile organic substances (VOS) in New Jersey, the Department of Environmental Protection (DEP) proposed *N.J.A.C.* 7:27–23, a rule entitled "Volatile Organic Substances in Consumer Prod-

ucts." 20 *N.J.R.* 2002–2007. The rule was intended to be part of New Jersey's regulatory strategy for the control of ozone levels as prescribed in the State Implementation Plan (SIP), which was developed under the Clean Air Act, 42 *U.S.C.* § 7604 (1982). The rule as proposed had separate elements. The first, not in issue here, addressed architectural coatings and set forth a schedule of allowable VOS content for various categories of such coatings. The second prong of the rule, as proposed, addressed air fresheners and consumer insecticides. The proposal indicated that these products were chosen because they were "determined to be among the largest consumer product sources of VOS emissions." The rule required that the products affected reduce their content of VOS to 50 percent by weight by February 28, 1990; to 25 percent by weight by February 28, 1992, and to 5 percent by weight by February 28, 1994.

In proposing *N.J.A.C.* 7:27–23, the DEP relied primarily on data compiled in 1986 and 1987 surveys by the Science Applications International Corporation (SAIC). According to the 1986 SAIC study, all consumer products were estimated to result in average VOS emissions of 39,201 tons per year in New Jersey. Of that amount 1310 tons were attributed to air fresheners ("room deodorants and disinfectants") and 1750 tons were attributed to consumer insecticides ("insect sprays", "insect repellants", "animal insecticides"). These amounts were revised by the 1987 SAIC study to 1384 tons and 1988 tons, respectively, thus attributing 3372 tons of annual VOS emissions to air fresheners and consumer insecticides. On the basis of the SAIC surveys, the DEP proposal concluded that:

When the VOS content limits on air fresheners and consumer insecticides are fully implemented, they will prevent approximately 3,300 tons of VOS from being emitted into the atmosphere each year from the use of these household products. This estimated reduction is based on applying the five percent by weight VOS limit to the inventory for New Jersey developed by SAIC. At least 45 percent, or about 1,500 tons, of this reduction will occur by February 28, 1990 when the first phase 50 percent VOS limit is fully implemented. Another 30 percent of the total reduction will be realized by February 28, 1992, when the second phase 25 percent VOS limit is in full effect. The full reduction will be

realized by February 28, 1994, when the implementation of the third and final phase five percent limit is completed.

On September 22, 1988, a public hearing was held on the proposed rule, during which testimony and written comments were accepted. On January 27, 1989, *N.J.A.C.* 7:27–23 was adopted with technical and substantive changes from the proposal. 21 *N.J.R.* 462–483. The rule retained the requirement that the VOS content of air fresheners be limited to 50 percent by February 28, 1990. However, DEP deferred adoption of the proposals requiring the reductions to 25 percent and to 5 percent pending further study. In addition, DEP deferred all regulations concerning the VOS content of insecticides for further study and clarified that disinfectant air fresheners were not intended to be governed by the rule.

As a result of these changes, only non-disinfectant air fresheners with more than 50% VOS are subject to the regulation. Only four specific items out of the entire consumer products market are thus affected by the rule. The manufacturer of one of the products is appellant Scott's Liquid Gold, Inc. (Scotts). The product is "Touch of Scent", one of Scotts' two principal product lines. It is an aerosol air freshener "that is placed in a wall-mounted dispenser and activated, when needed, by the touch of a fingertip, releasing a small amount of air freshener to remove unwanted odors." It is classified as approximately 99% VOS. According to Scotts, it has been unable to come up with an alternative method of formulating this product with the same unique properties so as to meet the requirements of the rule. A ban on the sale and manufacture of "Touch of Scent" in New Jersey, a major market and the distribution center for the Northeast region, would cost Scotts $5 million in annual revenue. (Scotts' 1988 revenues amounted to $21.6 million, with a net income of $819,000.) Unlike Scotts, the three other products subject to the rule (Boyle–Midway's Wizard Dry Breezes, Drackett's Renuzit Fresh N Dry and Amway's dry air freshener) are manufactured by large corporations with multiple lines of other products including other air fresheners.

In June 1989, DEP received a petition from retailers of architectural coatings affected by the regulations to allow the continued sale after February 28, 1990 of packages manufactured prior to that date. DEP determined to grant that petition and has proposed an amendment which will apply both to architectural coatings and air fresheners. 21 *N.J.R.* 3488. As to air fresheners, the proposal provides that as of February 28, 1990, no air fresheners with a VOS content greater than 50% may be manufactured for sale in New Jersey and as of the same date, no air fresheners with a VOS content greater than 50% and manufactured after that date may be sold at retail in New Jersey. 21 *N.J.R.* 3488. Scotts has received the benefit of this proposed amendment as a result of an agreement with DEP while this action was pending.

Scotts appeals, advancing a series of procedural and substantive challenges to the rule. Among those challenges is the claim that the rule, as adopted, differs so substantially from the rule as proposed that it violates the Administrative Procedure Act (A.P.A.). Because we agree with this contention, we reverse the promulgation of the rule and remand the case for further proceedings consonant with the A.P.A.

The validity of an administrative agency action depends on compliance with provisions of the A.P.A. *N.J.S.A.* 52:14B–1 *et seq.* *Woodland Private Study Group v. State,* 109 *N.J.* 62, 533 *A.*2d 387 (1987). Where rule-making is concerned, the purpose of the procedure set forth in the A.P.A. is to give those affected by the proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as "a means of informing regulators of possibly unanticipated dimensions of a contemplated rule." *American Employers' Ins. v. Commissioner of Insurance,* 236 *N.J.Super.* 428, 434, 566 *A.*2d 202 (App.Div.1989). Thus, *N.J.S.A.* 52:14B–4(a)(3) requires an agency to allow "all interested persons reasonable opportunity to submit data, views, or arguments" prior to the adoption of any rule. *N.J.A.C.* 1:30–4.3 provides for adherence to this

requirement when the rule as proposed varies from the rule as adopted:

(a) Where, following the notice of a proposed rule, an agency determines to make changes in the proposed rule which are so substantial that the changes effectively destroy the value of the original notice, the agency shall give a new notice of proposed rule and public opportunity to be heard.

In assessing whether the changes from the proposal are so substantial as to warrant republication and a new hearing, the A.P.A. provides that consideration shall be given to the extent to which the changes:

1. Enlarge or curtail who and what will be affected by the proposed rule;
2. Change what is being prescribed, proscribed or otherwise mandated by the rule;
3. Enlarge or curtail the scope of the proposed rule and its burden on those affected by it. [*N.J.A.C.* 1:30–4.3(b).]

Changes which are not substantial include:

1. Spelling, punctuation, technical, and grammatical corrections;
2. Language or other changes, whose purpose and effect is to clarify the proposal or correct printing errors; and
3. Minor substantive changes which do not significantly enlarge or curtail the scope of the rule and its burden, enlarge or curtail who or what will be affected by the rule, or change what is being prescribed, proscribed or mandated by the rule. [*N.J.A.C.* 1:30–4.3(c).]

*See also Society for E.E.D. v. New Jersey D.E.P.,* 208 *N.J.Super.* 1, 8, 504 *A.*2d 1180 (App.Div.1985). Applying these standards to the variance between *N.J.A.C.* 7:27–23 as proposed and as finally adopted it is clear that republication and an additional opportunity to comment must be made available to those adversely affected by the rule.

The rule, as proposed, applied to air fresheners and consumer insecticides and was specifically posited upon the anticipated reduction of 3300 tons of VOS emissions (approximately 1300 from air fresheners and disinfectants and 2000 from consumer insecticides) beginning in 1990 and culminating in 1994 when the reduction of VOS to 5% by weight came into effect. Because of the manner in which the reductions were staged—to 50% in 1990, to 25% in 1992, and to 5% in 1994—the number of affected products was expected to increase as each plateau date was reached, with the entire air freshener/insecticide industry

affected by the 1994 target date. Even as proposed, the reduction of total VOS emissions was modest—8% of the consumer product VOS emissions and one-half of one percent of all VOS emissions by 1994.

As adopted, the rule dramatically lessened DEP's projected reduction in VOS tonnage. According to the DEP proposal and based on the SAIC surveys, insecticides account for 2000 of the projected 3300 ton reduction. Of the 1300 tons attributable to air fresheners and disinfectants, only 45% or 585 tons will be eliminated in 1990. From that reduction the elimination of the disinfectant air freshener from the scope of the rule must be accounted for. In short, the effect of the proposal was significantly curtailed in the adopted rule.

At the same time, the broad product scope of the rule was eviscerated and only four consumer products out of the entire chemical consumer product market remain subject to the rule. The Attorney General argues that this is inconsequential because the actual burden on Scotts did not change between the proposal and the promulgation. While it is true that Scotts was included in the proposed rule and is included in the final rule, the idea that this ends the inquiry grossly oversimplifies the case. Built into the staged reduction proposal was an industry-wide incentive to reformulate the products at issue because by 1994 the entire industry would be subject to the rule. By eliminating all but four products from the scope of the rule the industry-wide incentive for reformulation was lost. Now the burdens and costs of reformulation fall solely on Scotts and the three other manufacturers. That this was entirely unanticipated is underscored by the fact that Scotts was represented at the public hearing by an agent of the industry—the president of the Chemical Specialities Manufacturers Association (CSMA)—who addressed the proposal from an industry-wide point of view. Indeed, the Attorney General argues here that Scotts never made a presentation at the public hearing about the adverse economic impact the rule would have on it. The reason for this is obvious. As one manufacturer in an entire industry

ultimately subject to regulation, Scotts never anticipated the relevance of its particular economic status *vis a vis* the rule. Likewise it did not expect to shoulder the entire burden of product reformation without at least some benefit from industry-wide efforts made on an industry-wide timetable. Clearly, what Scotts would have presented at the hearing had the adopted rule been the proposal is quite distinct from what was presented on its behalf by CSMA. This is especially true in light of the disproportion between the reduced benefit projected by the adopted rule and the enhanced burden on Scotts.

In our view, the changes which were made in the rule between proposal and adoption significantly "curtail who and what will be affected by the proposed rule"; "change what is being proscribed", and "enlarge the burden on those affected" by the rule. *N.J.A.C.* 1:30–4.3(a)(1), (2) & (3). The changes are not technical, insubstantial alterations but strike at the heart of the rule itself. In short, the value of the original notice of rule-making was abrogated by the substantial alteration of the rule between proposal and promulgation. *N.J.A.C.* 1:30–4.3(a). This is exactly what the A.P.A. intended to avoid.

The matter is remanded to the Commissioner for action consonant with the A.P.A. She may republish the rule in such form as she sees fit so long as those affected by it are given a fair opportunity to be heard as to its contents.

Reversed and remanded.