742 A.2d 997

IN THE MATTER OF THE ADOPTION OF N.J.A.C. 9A:10–7.8(b).

Superior Court of New Jersey
Appellate Division

Submitted December 1, 1999—Decided January 3, 2000.

Before Judges KING, KLEINER and LEFELT.

*Dughi & Hewit,* for appellant College Savings Bank (*Christopher J. Christie* and *Gary L. Riveles,* on the brief).

*John J. Farmer, Jr.,* Attorney General, attorney for respondent New Jersey Higher Education Assistance Authority (*Mary C. Jacobson,* Assistant Attorney General, of counsel; *David Earle Powers,* Senior Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LEFELT, J.S.C. (temporarily assigned).

In June 1998, the Higher Education Assistance Authority ("Authority") adopted an amendment to *N.J.A.C.* 9A:10–7.8(b). College Savings Bank ("Savings") claims that the variance between the May 1998 proposed amendment and the June 1998 adopted amendment was so substantial that the value of the original notice was destroyed. Therefore, Savings appealed seeking a remand instructing Authority to re-propose the amendment, providing an additional opportunity for public comment. We reject Savings's appeal and affirm.

The rule in question implements part of the 1997 New Jersey Better Education Savings Trust ("NJBEST") Act. *N.J.S.A.* 18A:72–43 to –54 (re-codified at *N.J.S.A.* 18A:71B–35 to –46, effective April 26, 1999). NJBEST was intended to assist families saving for college tuition. To accomplish this purpose, the legisla-

ture established the NJBEST Trust in Authority, *N.J.S.A.* 18A:72–46, and the Office of Student Assistance was given responsibility for administering the NJBEST program. *Id.* at –47.

For any qualified person who participates in the program, interest earned on NJBEST individual trust accounts is free from federal income tax until the time of qualified withdrawal, and is also exempt from state income tax. There are also scholarship and financial aid advantages to NJBEST participants who are attending New Jersey institutions of higher education. *Id.* at–51 and –52.

Authority first proposed regulations for the NJBEST program in October 1997. 29 *N.J.R.* 4372(a) (October 20, 1997). Because Authority had no basis to determine program costs, the adopted regulations were silent as to the amount of any fees to be charged by Authority, and merely echoed Authority's statutory authorization to impose such fees. 30 *N.J.R.* 68(b) (January 5, 1998).

Thereafter, Authority selected the Department of the Treasury's Division on Investments to act as investment manager for the trust, *N.J.S.A.* 18A:72–45 and –49(a), and agreed that State Street Bank would provide certain financial services. Authority then entered into a contract with a firm to provide advertising services for NJBEST. Savings opposed all of these actions.

Savings competes with the NJBEST program. It markets and runs a program for customers seeking to invest their funds to provide for a college education. In fact, Savings has a patented program that it uses to determine the investment amounts necessary to assure coverage of projected college tuition costs.

On April 20, 1998, Authority voted to propose amendments to the original implementing regulations for NJBEST. The relevant proposed amendment was published in the New Jersey Register, and provided, in pertinent part:

9A:10–7.4 Procedure for opening an account

2. Paying the application fee ... which shall be no more than $100.00.

9A:10–7.8 Fees and charges

(a) The Authority may charge, impose and collect reasonable administrative fees, investment fees, and service charges in connection with any agreement, contract or transaction relating to the program. These fees and charges shall be determined by the Authority after consultation with the investment manager or contractor. These fees and charges may be imposed directly on contributors to the program or may be taken as a percentage of the investment earnings on accounts.

(b) The Authority shall charge an investment fee and service charge in an amount not to exceed four percent of the earnings of the trust.

[30 *N.J.R.* 1719 (May 18, 1998).]

In the required economic impact portion of the proposal, *N.J.S.A.* 52:14B–4(a)(2), Authority noted that:

The application fee, investment fee and service charge proposed in these rules is a cap which will in the adopted rules be an exact amount and exact percentage after the Authority has approved these amounts in its next meeting. Again, these fees and charges are intended to be modest.

[30 *N.J.R.* 1708 (May 18, 1998).]

In response to its entire proposal, Authority received only a comment from Savings. In pertinent part, Savings stated:

The Authority has not made clear whether [the investment fee and service charge] is an annual charge or one applied over the term of the investment. Furthermore, it is unclear how NJBEST is going to pay its service providers such as the administrator and marketer if the Trust fails to earn money.

Authority responded to Savings's comment by clarifying that there would be an annual account maintenance fee and an annual investment fee and service charge. The maintenance fee would be assessed to NJBEST Program participants regardless of trust earnings, and the investment fee and service charge would be a reduced percentage of trust earnings.

Concerned that its contemplated changes to the proposed amendment might have required re-proposal, Authority consulted the Office of Administrative Law ("OAL"), the agency responsible for enforcing and advising agencies of their rule-making obligations. *N.J.S.A.* 52:14F–5f and –5h. OAL advised Authority that, in its opinion, re-noticing was not required.

Next, Savings attended Authority's June 26, 1998 meeting, at which Authority considered whether to adopt the rule with the contemplated amendments, amendments that were apparently at least partially developed in response to Savings's comments. Sav-

ings argued for re-notification because, according to Savings, the proposal based the investment fee and service charge on a percentage of earnings, whereas the rule Authority intended to adopt based the fee and charge on a percentage of assets. Savings claimed that depositors would be substantially worse off under the adopted rule than they would be if Authority adopted the rule as proposed. Authority rejected Savings's arguments and adopted the following rule, published in the August 3, 1998 New Jersey Register:

9A:10–7.8 Fees and charges

(b) The Authority shall charge contributors a $15.00 annual account maintenance fee.

(c) The Authority shall charge an annual investment fee and service charge in the amount of the first one percent of the earnings of the Trust for periods when earnings are greater than one percent, or the actual earnings of the Trust for periods when earnings are one percent or less.

[30 *N.J.R.* 2919 (August 3, 1998).]

On September 18, 1998, Savings then filed a petition for rulemaking seeking repeal of the rule in question. *N.J.S.A.* 52:14B–4(f). Savings again argued that the adopted rule changed the method by which the investment fee and service charge were to be calculated, resulting in participants being required to pay much more than in the proposed regulation. Further, Savings contended that this change occurred without adequate notice to the public and, therefore, the rule should be repealed and re-proposed. Authority rejected the petition, 30 *N.J.R.* 4079(b) (November 16, 1998), and Savings appealed.

Before we begin our analysis, it is best to explain our review. The issue presented by this appeal is quite limited. We are not determining whether the NJBEST program is superior to Savings's program. We are also not deciding whether NJBEST is more costly to consumers than other programs. In particular, we are not determining whether the proposed rule would have been more advantageous to consumers than the adopted rule because there is no question that Authority had sufficient legislative authority to adopt either the rule as proposed or as amended on

adoption, no matter which calculation is used to assess trust earnings. *N.J.S.A.* 18A:72–50n.

Our sole inquiry is whether the agency so substantially changed the adopted rule from the proposed rule that interested persons lacked adequate notice of the agency's action. Or, stated another way, considering the rule the agency adopted, the question is whether the proposal notice adequately advised interested persons of the agency's adoption.

The Administrative Procedures Act, *N.J.S.A.* 52:14B–1 to –24, mandates that before adopting any rule, the agency must permit "all interested persons reasonable opportunity to submit data, views or arguments[.]" *N.J.S.A.* 52:14B–4(a)(3). The OAL's rule-making regulations provide further guidance on changes between proposal and adoption:

> Where, following the notice of a proposed rule, an agency determines to make changes in the proposed rule which are so substantial that the changes effectively destroy the value of the original notice, the agency shall give a new notice of the proposed rule and public opportunity to be heard.
>
> [*N.J.A.C.* 1:30–4.3(a) ]

OAL rules further inform that new notice is not required for "[m]inor substantive changes which do not significantly enlarge or curtail the scope of the rule and its burden, enlarge or curtail who or what will be affected by the rule or change what is being prescribed, proscribed, or mandated by the rule." *N.J.A.C.* 1:30–4.3(c)3. *See, In re Regulations Governing Volatile Organic Substances in Consumer Prod.,* 239 *N.J.Super.* 407, 413–14, 571 *A.2d* 971 (App.Div.1990) (discussing changes that eviscerated the proposed rule's scope).

 Obviously, too restrictive a construction of the applicable rule-making principles would, in effect, discourage an agency from making changes in response to comments. The proper construction of these principles should not condemn a responsive agency, that wishes to modify its proposed action because of comments received, to indefinite and endless re-proposals. Some changes can be made upon adoption that do not require re-proposal. *Insurance Brokers Ass'n, Inc. v. Sheeran,* 162 *N.J.Super.* 34, 40,

392 *A.*2d 203 (App.Div.), *certif. denied,* 78 *N.J.* 408, 396 *A.*2d 594 (1978). To determine whether re-proposal is required, we must focus on whether the changes destroyed the value of the original notice. *In re Adoption of N.J.A.C. 7:7A–1.4,* 240 *N.J.Super.* 224, 227–28, 573 *A.*2d 162 (App.Div.1989), *rev'd on other grounds,* 118 *N.J.* 552, 573 *A.*2d 143 (1990).

■ In the economic impact portion of its proposal, Authority announced that the proposed application fee, investment fee, and service charge were capped at the amounts proposed, and that exact amounts would be included in the adoption. A reasonable interested person would understand this notice to mean that Authority could adopt amounts less than the proposal, but Authority did not intend to adopt amounts that would be greater than the proposal. Authority then specifically announced in its proposal (proposed as *N.J.A.C.* 9A:10–7.4), that it would charge an application fee for opening an account of "no more than $100.00." Accordingly, when Authority decided on adoption not to require an application fee, this was within its proposed notification and properly adopted.

■ Authority also adopted a $15 annual maintenance fee. The proposal did not indicate the specific amount of any maintenance fee. However, Savings, in its comments, questioned how Authority would pay its service providers if the Trust failed to earn money. The maintenance fee was adopted in direct response to Savings's comment. When an agency changes its proposed rule in response to an objection, later argument, by the same objector, that the change destroyed the value of the original notice should be carefully scrutinized. *In re Adoption of Amendments to N.J.A.C. 7:27–16,* 244 *N.J.Super.* 334, 346–47, 582 *A.*2d 824 (App. Div.1990). Also, the proposal noted that Authority may charge "reasonable administrative fees." A $15 annual fee for maintaining the fund appears to be reasonable and modest, especially when considered in the context of Authority declining to adopt its proposed $100 application fee. Moreover, the proposal for "reasonable administrative fees" provided sufficient notice to be ade-

quately dealt with by any opponents. *Society for Envll. Econ. Dev. v. New Jersey Dep't of Envtl. Protection*, 208 *N.J.Super.* 1, 4, 504 *A.*2d 1180 (App.Div.1985). Therefore, the annual maintenance fee was also properly adopted.

Savings's main contention, however, concerns Authority's adoption of annual investment fees and service charges of not more than one percent of the earnings of the trust. Savings asserts that Authority proposed fees and charges based on earnings, but adopted fees and charges based on a percentage of assets or investment yield. Authority rebuts Savings's argument by contending that it had consistently intended to utilize the investment yield approach to calculate the fee.

We reject Savings's argument that Authority changed its method of calculation, not because of Authority's counter assertion, but because the language of the notice does not support Savings's position. The language referencing trust earnings in both notice and adoption are substantially similar, if not identical. We discern no difference in the essential language of the proposal and the adoption. The proposal imposed the investment fee and service charge on the "earnings of the [t]rust." Because the proposal provided that this charge would not exceed four-percent of the trust earnings, there was adequate notice when Authority adopted an investment fee and service charge of not more than one-percent of the trust earnings. The changes on adoption are clarifications that do not enlarge or curtail the scope of the rule. Accordingly, the public had adequate notice of the agency action and the rule was properly adopted.

The parties vigorously dispute the effect of the adopted amendment on consumers. Savings asserts that consumers will definitely suffer from the adoption, while Authority asserts that consumers will benefit from the adoption. Savings asserts that more modest fees are charged, by program managers, for competing state college savings plans in New York, Delaware, Connecticut, Rhode Island, Massachusetts, New Hampshire, Vermont, Maine and other states. Savings argues that Authority has elected to ignore this standardized structure in favor of its more complex

and confusing fee structure. Thus, according to Savings, the fee structure only further increases the burden on consumers.

Alternatives are available for individuals seeking to save money to pay college tuition. These alternatives range from education individual retirement accounts ("IRAs") to Montana's counterpart to NJBEST that Savings actually markets. Participation in the NJBEST program is entirely voluntary. If Savings is correct and Authority has adopted fees and charges that are "significantly higher than competitive market levels," then market forces may convince Authority to modify its fees and charges. This appeal will not.

We also note that the OAL, upon consultation, advised Authority that no re-publication was required. We respect the OAL's expertise in rule-making and acknowledge its vigilance in protecting public access to agency rule-makings. We find the OAL advice significant in this matter. *GAF Corp. v. New Jersey Dep't Envtl. Protection*, 214 *N.J.Super.* 446, 519 *A.*2d 931 (App.Div. 1986); *Public Serv. Elec. and Gas Co. v. New Jersey Dep't Envtl. Protection*, 193 *N.J.Super.* 676, 475 *A.*2d 665 (App.Div.1984), *aff'd*, 101 *N.J.* 95, 501 *A.*2d 125 (1985).

Affirmed.