817 A.2d 355 (2003)
358 N.J. Super. 135
In the Matter of the COMMISSIONER'S FAILURE TO ADOPT 861 CPT CODES and to Promulgate Hospital and Dental Fee Schedules.
Superior Court of New Jersey, Appellate Division.
Argued January 15, 2003.
Decided March 7, 2003.
*356 Susan Stryker argued the cause for appellant American Insurance Association *357 (Ms. Stryker and Mitchell A. Livingston, Trenton, on the brief).
Doreen J. Piligian, Deputy Attorney General, argued the cause for New Jersey Department of Banking and Insurance (David Samson, Attorney General of New Jersey, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Piligian and Karyn G. Gordon, Deputy Attorney General, on the brief).
Before Judges KING, WECKER and LISA.
The opinion of the court was delivered by KING, P.J.A.D.
In this case, American Insurance Association (AIA), a national insurance trade association of property and casualty insurance companies licensed to do business in every state, appeals from the adoption of a physicians' fee schedule by the Commissioner of Banking and Insurance (Commissioner), N.J.A.C. 11:3-29 Appendix (Exhibit 1), and from the failure to adopt a hospital fee schedule. AIA appeals on behalf of its member insurers writing private passenger automobile insurance in New Jersey. AIA contends that by adopting a fee schedule for benefits payable under personal injury protection (PIP) laws which included only 92 Current Procedural Terminology (CPT) codes, after having proposed 953 codes, the Commissioner violated the Administrative Procedures Act (APA), N.J.S.A. 52:14B-1 to -25. AIA contends that the rule adoption should be invalidated because it departed substantially from the rule proposal. AIA also contends that the Commissioner failed to promulgate 861 additional CPT codes and to promulgate a hospital fee schedule, as required by N.J.S.A. 39:6A-4.6. We reverse the adoption of the Appendix, Exhibit 1, because of deficient notice and substantial deviation from the rule proposal. We remand to the agency for reproposal.

I
On December 18, 2000, pursuant to N.J.S.A. 39:6A-4.6(a), the Department of Banking and Insurance (Department) published proposed new rule N.J.A.C. 11:3-29 Appendix, Exhibits 1 through 5; proposed repeal of N.J.A.C. 11:3-29.6; and proposed amendments N.J.A.C. 11:3-29.1, -29.2, -29.3, -29.4 and -29.5. 32 N.J.R. 4332(a) (December 18, 2000). The proposal set forth medical fee schedules for automobile insurance PIP and motor bus medical expense insurance coverage, including a physicians' fee schedule (Exhibit 1), a home care services fee schedule (Exhibit 3), an ambulance services fee schedule (Exhibit 4), and a schedule for durable medical equipment and prosthetic devices (Exhibit 5). 32 N.J.R. at 4333, 4337-77. Exhibit 2, a dental fee schedule, was reserved. There was no proposed hospital fee schedule. Id. at 4357.
N.J.S.A. 39:6A-4.6 provides:
a. The Commissioner of Banking and Insurance shall, within 90 days after the effective date of P.L.1990, c. 8 (C.17:33B-1 et al.), promulgate medical fee schedules on a regional basis for the reimbursement of health care providers providing services or equipment for medical expense benefits for which payment is to be made by an automobile insurer under personal injury protection coverage pursuant to P.L.1972, c. 70 (C.39:6A-1 et seq.), or by an insurer under medical expense benefits coverage pursuant to section 2 of P.L.1991, c. 154 (C.17:28-1.6). These fee schedules shall be promulgated on the basis of the type of service provided, and shall incorporate the reasonable and prevailing fees of 75% of the practitioners within the region. If, in the case of a specialist *358 provider, there are fewer than 50 specialists within a region, the fee schedule shall incorporate the reasonable and prevailing fees of the specialist providers on a Statewide basis. The commissioner may contract with a proprietary purveyor of fee schedules for the maintenance of the fee schedule, which shall be adjusted biennially for inflation and for the addition of new medical procedures.
b. The fee schedule may provide for reimbursement for appropriate services on the basis of a diagnostic-related (DRG) payment by diagnostic code where appropriate, and may establish the use of a single fee, rather than an unbundled fee, for a group of services if those services are commonly provided together. In the case of multiple procedures performed simultaneously, the fee schedule and regulations promulgated pursuant thereto may also provide for a standard fee for a primary procedure, and proportional reductions in the cost of the additional procedures.
c. No health care provider may demand or request any payment from any person in excess of those permitted by the medical fee schedules established pursuant to this section, nor shall any person be liable to any health care provider for any amount of money which results from the charging of fees in excess of those permitted by the medical fee schedules established pursuant to this section.
In the Medicaid context, DRGs (Diagnosis Related Groupings) are described as "specified diagnostic categories for which hospitals receive a predetermined fixed amount for inpatient services." Atlantic City Med. Ctr. v. Squarrell, 349 N.J.Super. 16, 22, 793 A.2d 10 (App.Div.2002).
According to the Department summary, the proposal increased the number of CPT codes for physicians' services from 746 to 953, and implemented the requirement of N.J.S.A. 39:6A-4.6 to "incorporate the reasonable and prevailing fees of 75% of the practitioners" within a region. 32 N.J.R. 4332(a), 4333 (December 18, 2000). In accordance with a 1997 amendment to N.J.S.A. 39:6A 4.6(a), the Department had contracted with a proprietary purveyor of fee schedules to develop the new schedule. Ibid. Although the fee schedule adopted in 1990 had been based on billed feesthe charges set forth on the bills submitted to health insurersthe revised fee schedules were based on paid feesthe amounts actually paid as reimbursements to providers. Ibid. This change reflected the increasing disparity between billed fees and paid fees. Ibid.
On January 25, 2001 the Department held a hearing to receive public comments. 33 N.J.R. 1590(a) (May 21, 2001). On May 21, 2001 the Commissioner adopted these portions of the proposal: textual amendments to N.J.A.C. 11:3-29.1, -29.2, -29.4 and -29.5, and the repeal of N.J.A.C. 11:3-29.6(b). Id. at 1596.
On June 22, 2001, effective July 16, 2001, the Commissioner adopted the final portion: amendments N.J.A.C. 11:3-29.3 and -29.4 (remaining part); repeal of N.J.A.C. 11:3-29.6 (remaining part); and new rules N.J.A.C. 11:3-29 Appendix, Exhibits 1, 3, 4 and 5. 33 N.J.R. 2507(a) (July 16, 2001). In contrast to the proposal to increase the number of CPT codes for physicians' services from 746 to 953, the adoption set forth in Exhibit 1 listed just 92 CPT codes, setting the limit of an insurer's liability for the remaining 861 proposed codes at the providers' usual, reasonable and customary fee. The Department explained this dramatic quantitative departure from the proposal this way:
The physicians' fees adopted cover the CPT codes that are the most commonly *359 used for treatment of auto accident injuries and represent approximately 85 percent of all codes billed for PIP reimbursement. For those CPT codes that are no longer on the fee schedule, the insurer's limit of liability is the providers' usual, reasonable and customary fee as provided at N.J.A.C. 11:3-29.4(e).
The Department has reviewed the frequency that [sic] individual CPT codes are billed for PIP reimbursement and has determined that by adoption of a physicians' fee schedule at this time that contains the 92 most commonly used CPT codes, the Department is minimizing the regulatory burden while carrying out the cost containment objectives of the Automobile Insurance Cost Reduction Act of 1998 ("AICRA").
[33 N.J.R. 2507(a), 2507 (July 16, 2001).]
The Department asserted that the filing was made "with substantive and technical changes not requiring additional public notice and comment (see N.J.A.C. 1:30-6.3)." Id. at 2507.
On August 22, 2001 AIA filed an appeal from the final adoption, R. 2:2-3(a)(2), and sought a court order for the Commissioner to adopt the remaining proposed CPT codes for the physicians' fee schedule and to adopt fee schedules for all medical expenses reimbursable under PIP, including hospital and dental expenses. The dental fee schedule was later adopted. 34 N.J.R. 1032(a) (March 4, 2002). That aspect of this appeal is moot. On September 24 and November 1, 2001 we denied AIA's motions for a stay and for summary disposition.
This appeal presents two issues:
I. DID THE COMMISSIONER VIOLATE THE APA AND DUE PROCESS BY ADOPTING A RULE THAT DEPARTED SUBSTANTIALLY AND SUBSTANTIVELY FROM THE RULE PROPOSAL?
II. DID THE COMMISSIONER VIOLATE N.J.S.A. 39:6A-4.6 BY FAILING TO ADOPT MEDICAL FEE SCHEDULES ADDRESSING ALL MEDICAL EXPENSE BENEFITS PAYABLE UNDER PIP, INCLUDING HOSPITAL FEE SCHEDULES?

II
AIA first contends that the adoption of Appendix Exhibit 1 violated the APA and fundamental principles of due process because the adoption departed substantially and substantively from the proposed Exhibit 1. The Department responds that reproposal was not required under N.J.A.C. 1:30-6.3(a), because the changes to Exhibit 1 were not significant. We agree with AIA.
The APA requires that an agency, before adopting, amending or repealing a rule, "[a]fford all interested persons reasonable opportunity to submit data, views or arguments, orally or in writing." N.J.S.A. 52:14B-4(a)(3). The purpose of the APA guidelines is "to give those affected by the proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as `a means of informing regulators of possibly unanticipated dimensions of a contemplated rule.'" Matter of Adoption of Regulations Governing Volatile Organic Substances, 239 N.J.Super. 407, 411, 571 A.2d 971 (App.Div.1990) (quoting Am. Employers' Ins. Co. v. Comm'r of Ins., 236 N.J.Super. 428, 434, 566 A.2d 202 (App. Div.1989)). See generally 37 New Jersey Practice, Administrative Law and Practice § 3.13 at 120 (Lefelt, Miragliotta and Prunty (2d ed. 2000) ("Lefelt") ("Rule Changes Upon Adoption"). AIA also points to constitutional guarantees of due *360 process but impliedly concedes that compliance with the APA satisfies the constitutional standard.
The codified rules for agency rulemaking describe the circumstances in which changes in a proposed rule require new notice and opportunity to be heard before promulgation:
Variance between the rule as proposed and as adopted
(a) Where, following the notice of proposal, an agency determines to make changes in the proposed rule which are so substantial that the changes effectively destroy the value of the original notice, the agency shall give a new notice of proposal and public opportunity to be heard.
(b) In determining whether the changes in the proposed rule are so substantial, consideration shall be given to the extent that the changes:
1. Enlarge or curtail who and what will be affected by the proposed rule;
2. Change what is being prescribed, proscribed or otherwise mandated by the rule;
3. Enlarge or curtail the scope of the proposed rule and its burden on those affected by it.
(c) Where the changes between the rule as proposed and as adopted are not substantial, the changes shall not prevent the adopted rule from being accepted for filing. Changes which are not substantial include:
1. Spelling, punctuation, technical, and grammatical corrections;
2. Language or other changes, whose purpose and effect is to clarify the proposal or correct printing errors; and
3. Minor substantive changes which do not significantly enlarge or curtail the scope of the rule and its burden, enlarge or curtail who or what will be affected by the rule, or change what is being prescribed, proscribed or mandated by the rule.

[N.J.A.C. 1:30-6.3.] According to AIA, the rule, as proposed, was welcomed by it and its member insurers because the 953 codes in Exhibit 1 represented an increase from 746 codes and an articulation of covered procedures. The 92 CPT codes actually adopted, in contrast, represented a drastic decrease in number, more than 85%. AIA claims that the regulated community was deprived of the opportunity to contest the Department's contention that the rules as adopted represent the significant majority of costs and procedures incurred by PIP providers (about 85%) and eased the regulatory burden.
As noted, the Department admits that the adoption was made with substantive, as well as technical changes, but asserts that, under N.J.A.C. 1:30-6.3, the changes did not require additional public notice and comment. 33 N.J.R. 2507(1), 2507 (July 16, 2001). The Department now contends that the substantive changes fell into the exception set forth in N.J.A.C. 1:30-6.3(c)(3) because they were minor and did not significantly enlarge or curtail either the scope of the rule and its burden or the things or persons affected, nor did they change what was prescribed, proscribed or mandated.
The Department distinguishes this case factually from Matter of Adoption of Regulations Governing Volatile Organic Substances, 239 N.J.Super. at 414, 571 A.2d 971. There, we found that the changes "struck at the heart" of a proposed Department of Environmental Protection (DEP) rule and destroyed the value of the original notice. Ibid. In Volatile Organic Substances, the rule as adopted reduced the intended regulatory efficacy by dramatically lessening the projections of the DEP for reduction of volatile organic substances *361 (VOS) tonnage. It also narrowed the scope, because the adoption was limited to only four consumer products out of the broad chemical consumer market originally targeted, thus eliminating industry-wide incentives for reformulation. Id. at 413, 571 A.2d 971.
In contrast, in Matter of Adoption of N.J.A.C. 9A:10-7.8(b), 327 N.J.Super. 149, 158, 742 A.2d 997 (App.Div.2000), we found that reproposal was not required where the Higher Education Assistance Authority (Authority), in response to comments, changed a proposed rule governing the treatment of individual trust accounts established under the 1997 New Jersey Better Education Saving Trust Act (NJBEST). N.J.S.A. 18A:71B-35 to -46. We observed that too restrictive a construction of the principles of N.J.A.C. 1:30-4.3, since recodified at subsection -6.3, would discourage an agency from making changes in response to comments. Id. at 155, 742 A.2d 997. We found that the changes constituted clarification, and did not destroy the value of the original notice. Id. at 157, 742 A.2d 997.
The initial proposal provided for an application fee of no more than $100, reasonable administrative fees, investment fees and service charges, and an investment fee and service charge not to exceed four percent of the earnings of the trust. The Authority responded to a comment by clarifying that there would be an annual account maintenance fee and an annual investment fee and service charge. Id. at 153, 742 A.2d 997. The Authority then consulted the Office of Administrative Law (OAL), asked whether reproposal was required, and was advised that it was not. Ibid. The Authority adopted a $15 annual account maintenance fee and annual investment fees and service charges of one percent of the earnings of the trust, or actual earnings if earnings are less than one percent. Id. at 156-57, 742 A.2d 997. The original commenter challenged the rule adoption, arguing primarily that the Authority first proposed fees and charges based on earnings, but then adopted fees and charges based on a percentage of assets or investment yield. Id. at 157, 742 A.2d 997. We found the advice of the OAL significant and held there was no substantial change in the method of calculating the fees and charges. Id. at 157-58, 742 A.2d 997. We did not require reproposal.
The Department does not here contend that it sought or received advice from the OAL. It contends that the reduction from 953 codes to 92 codes did not alter either the application of the rule or its burden. The Department contends that the rule as adopted contained the treatment codes which represented 85% of all codes billed for PIP reimbursement; no new codes were added, and no dollar amounts changed. Moreover, though many fewer codes were enumerated, for the remaining codes, the insurer's limit of liability is the usual, customary and reasonable fee, as provided in N.J.A.C. 11:3-29.4(e).[1] Thus, the Department claims there is no danger of precipitous increases in costs, and the *362 obligations of the regulated community providers of PIP services and insurance companieswere neither enlarged nor curtailed by the change.
We find AIA's argument more persuasive. The reduction from 953 to 92 CPT codes was surely not minor, quantitatively speaking. The magnitude of the change suggests that it was major and substantive, substantial enough to destroy the value of the original notice. N.J.A.C. 1:30-6.3(a). It did "[c]hange what [was] being prescribed, proscribed or otherwise mandated by the rule," and did "curtail the scope of the proposed rule and its burden on those affected by it." N.J.A.C. 1:30-6.3(b)(2) and (3). The rule as adopted not only eliminated more than 800 proposed CPT codes, but repealed more than 600 of the CPT codes formerly in effect.
The Department's response to us, that the procedures included represent 85% of billing and that a sensible residual rule, N.J.A.C. 11:3-29.4(e), covers the remaining procedures, actually constitutes argument on the merits of the proposal. This was an argument the challengers here were entitled to confront during the comment period. As AIA contends, it lacked the opportunity to counter those arguments and was misled by the original proposal. We agree with AIA that this case is quite like Matter of Adoption of Regulations Governing Volatile Organic Substances, 239 N.J.Super. 407, 571 A.2d 971, and that the severe reduction in the number of CPT codes destroyed the value of the original notice.
Where the standards of N.J.A.C. 1:30-6.3(a), facially applied, demonstrate a rule adoption as a substantial change from the proposal, to the extent that the changes destroyed the value of the notice, republication is required. See In re Adopted Amendments N.J.A.C. 7:15-8, 349 N.J.Super. 320, 327-31, 793 A.2d 773 (App. Div.2002) (requiring reproposal of DEP rule). Obviously, our ruling does not pertain to the entire adoption, but only to the adoption of Exhibit 1. We hold that reproposal of the rule is necessary for that portion only; we reverse and remand for new notice and public hearing.
We do not void the present rule for procedural irregularity. The present system should remain in effect pending agency action. See Lefelt, § 3.14 at 124 ("Curative Remand of Invalid Rules"); see also K.P. v. Albanese, 204 N.J.Super. 166, 180, 497 A.2d 1276 (App.Div.), certif. denied, 102 N.J. 355, 508 A.2d 225 (1985). A regulatory void would serve no purpose and invite disorder.

III
AIA next argues that the Department, by addressing only a small percentage of the medical expenses reimbursable under PIP and not adopting a hospital fee schedule, failed to follow the directives of N.J.S.A. 39:6A-4.6. The Department responds that its decision represents an exercise of sound discretion.
We repeat the pertinent part of N.J.S.A. 39:6A-4.6(a):
The Commissioner of Banking and Insurance shall, within 90 days after the effective date of P.L.1990, c. 8 (C.17:33B-1 et al.), promulgate medical fee schedules on a regional basis for the reimbursement of health care providers providing services or equipment for medical expense benefits for which payment is to be made by an automobile insurer under personal injury protection coverage pursuant to P.L.1972, c. 70 (C.39:6A-1 et seq.), or by an insurer under medical expense benefits coverage pursuant to section 2 of P.L.1991, c. 154 (C.17:28-1.6). These fee schedules shall be promulgated on the basis of the type of service provided, and shall incorporate *363 the reasonable and prevailing fees of 75% of the practitioners within the region.
AIA asks us, based on this statutory mandate, to direct the Commissioner to develop medical fee schedules for all medical expenses reimbursable under PIP, including hospital fees.
The Legislature enacted N.J.S.A. 39:6A-4.6 in 1988 as a cost containment measure. Matter of Failure by Dep't of Banking and Ins., 336 N.J.Super. 253, 256, 764 A.2d 494 (App.Div.2001). In its original version, the statute required the Commissioner to promulgate medical fee schedules on a regional basis for PIP reimbursement to health care providers, based on the type of service provided. L. 1988, c. 119, § 10. The Fair Automobile Insurance Reform Act of 1990 (FAIR Act), N.J.S.A. 17:33B-1 to -64, which revised the motor vehicle insurance laws with the goal of lowering insurance costs, included an amendment to N.J.S.A. 39:6A-4.6. 336 N.J.Super. at 256, 764 A.2d 494; L. 1990, c. 8, § 7. The FAIR Act added the requirements in subsection (a) that the reimbursement rates "incorporate the reasonable and prevailing fees of 75% of the practitioners" within the region, and that the fee schedule be reviewed biennially by the Commissioner; it also prohibited health care providers from demanding or requesting any payment in excess of that permitted by the fee schedule (now subsection c). 336 N.J.Super. at 256-57, 764 A.2d 494; L. 1990, c. 8, § 7.
In 1997, the Legislature again amended N.J.S.A. 39:6A-4.6, authorizing the Commissioner in subsection (a) to "contract with a proprietary purveyor of fee schedules for the maintenance of the fee schedule, which shall be adjusted biennially for inflation and for the addition of new medical procedures"; it also added the current subsection (b). 336 N.J.Super. at 257, 764 A.2d 494; L. 1990, c. 8, § 7. The Automobile Insurance Cost Reduction Act of 1998 (AICRA), L. 1998, c. 21 and c. 22, which mandated rate rollbacks, authorized the Department to adopt regulations defining standard treatment protocols and diagnostic tests and services reimbursed under PIP policies. 336 N.J.Super. at 258, 764 A.2d 494. Those regulations, N.J.A.C. 11:3-4, were adopted in December 1998. Ibid. "AICRA intended to reduce costs to the insurance system by reducing unnecessary insurance company expenses." Ibid.
The customary method for review of agency action or inaction is direct appeal to the Appellate Division. Matter of Failure, 336 N.J.Super. at 261, 764 A.2d 494. The exceptional remedy of "[m]andamus is usually appropriate only where the right to performance of a ministerial duty is clear and certain." Id. at 262, 764 A.2d 494. Mandamus may compel the exercise of a discretionary function, but it may not be used to control the exercise of discretion. Ibid. An agency has broad discretion in deciding how to accomplish tasks assigned by the Legislature. Ibid.
This court will overturn an administrative determination only if it was arbitrary, capricious, unreasonable, or violated express or implied legislative policies. Id. at 263, 764 A.2d 494 (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963)). This court allows substantial deference to the interpretation of the agency charged with enforcing an act. New Jersey Tpk. Auth. v. Amer. Fed. of State, Cty. and Mun. Employees, 150 N.J. 331, 351, 696 A.2d 585 (1997). Particularly in the insurance field, the expertise and judgment of the Commissioner may be allowed great weight. Matter of Aetna Cas. and Sur. Co., 248 N.J.Super. 367, 376, 591 A.2d 631 (App.Div.), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991), certif. denied, 502 U.S. 1121, 112 S.Ct. 1244, 117 L. Ed.2d 476 (1992). We will overturn an *364 agency's interpretation of a statute it implements only when it is "plainly unreasonable." Merin v. Maglaki, 126 N.J. 430, 437, 599 A.2d 1256 (1992). The party challenging agency action bears the burden of overcoming these presumptions. Med. Soc'y of N.J. v. Div. of Consumer Affairs, 120 N.J. 18, 25, 575 A.2d 1348 (1990). The Department stresses that the medical fee schedules established at N.J.A.C. 11:3-29 never contained every possible treatment code, that the CPT codes enacted represent 85% of all codes billed, and that the "usual, customary and reasonable" fee standard satisfies the statutory cost-containment objective. The agency also stresses that no hospital fee schedule has ever existed, and that AIA did not object on this basis in its public comments to the December 2000 rule proposal. In the hospital fee situation, the agency told us at oral argument that there have been "few disputes," the existing industry standards are practical guidelines, and there is no need for a schedule. The Department observed that AIA presents no evidence to support its claim that the reduction in treatment code designations, and consequent reliance on the "usual, customary, and reasonable" standard, will result in higher expenses for insurers.
We agree with the Department that mandamus could not be used to direct the adoption of a particular form of fee schedule, or the inclusion of particular fees, such as hospital fees. This would be an impermissible attempt to control the exercise of administrative discretion. Matter of Failure, 336 N.J.Super. at 262, 764 A.2d 494. However, in substance what AIA alleges here, particularly with respect to the medical fee schedule, is that by adopting too few CPT codes, the Department exercised its discretionary powers arbitrarily and unreasonably. We agree with the AIA and find that reproposal is necessary. This will allow for fair comment on the great reduction in codes and refusal to promulgate a hospital fee schedule. If the Department continues to decline to adopt a hospital fee schedule, the reproposal should so specify. Articulated reasons then can be given for this decision before new rules are issued or eschewed.

IV
We reverse as to the adoption of Exhibit 1 because of defective notice, as discussed in II above. We do not reverse on the refusal to promulgate a hospital fee schedule. But we do conclude that the Department should give notice of its intention to decline to promulgate a hospital fee schedule, to allow the regulated community the ability to comment or make counter proposals.
Reversed and remanded.
NOTES
[1] N.J.A.C. 11:3-29.4(e) states:

The insurer's limit of liability for any medical expense benefit for any service or equipment not set forth in or not covered by the fee schedules shall be a reasonable amount considering the fee schedule amount for similar services or equipment in the region where the service or equipment was provided or, in the case of elective services or equipment provided outside the State, the region in which the insured resides. Where the fee schedule does not contain a reference to similar services or equipment as set forth in the preceding sentence, the insurer's limit of liability for any medical expense benefit for any service or equipment not set forth in the fee schedules shall not exceed the usual, customary and reasonable fee.